CHARLES L. ALLEN, CONTESTOR, v. JAMES GLYNN, CON-
TESTEE.

1. AUSTRALIAN BALLOT LAW—ERRORS IN PRINTING BALLOTS.

When public officers are entrusted with the preparation of ballots and ample provision is made for the correction of errors before election, it is too late after they have been voted, as a general rule, to interpose objections to the ballots for mere irregularities in the printing thereof.

2. ELECTION LAWS—PROVISIONS OF, MANDATORY.

All provisions of laws relating to elections are mandatory in the sense that they impose a duty upon those who come within their terms. It does not follow, however, that an election should be invalidated because of every departure on the part of public officers from the terms of the statute.

3. ERRORS ON THE PART OF THE COUNTY CLERK.

Where the law provides severe penalties against county clerks for violation of its provisions, failure on the part of a clerk to make proper publication of nominations, or error in printing the name of candidates under the wrong party device, will not necessarily invalidate the ballots.

4. ELECTION CONTESTS — RIGHT OF CONTESTOR TO HOLD OVER NOT CONSIDERED.

In a proceeding to contest the election of a district judge, the right of the contestant to hold over, on the ground that he was duly appointed to the office by the governor, and was acting as such judge at the time the contestee assumed to discharge the duties of the office, will not be considered.

*Election Contest— Opinions upon Motion to strike out Parts of the Complaint.*

THIS is an original proceeding, instituted in this court for the purpose of contesting an election in the Thirteenth Judicial District.

In 1891 the legislature adopted, in a modified form, the Australian Ballot Law. At the recent election, the first held since the provisions of the new law became operative, Charles L. Allen, contestor, James Glynn, contestee, and William T. Skelton, were opposing candidates for the office of district judge of the Thirteenth judicial district of this

state. The former received his nomination at the hands of the republician party of the district, Skelton, was nominated by the democrats, while Glynn ran as candidate of a third party commonly styled " The Peoples' Party." From the petition filed it appears that the official count, made by the state canvassing board, gave contestee 862 votes; contestor 860, and Skelton 508. Contestee having been declared elected, this proceeding has been instituted by contestor. The following provisions of the statute are necessary to a correct understanding of the opinion. Sess. Laws, 1891, P. 143 *et seq.*

Sec. 1. " All ballots cast in elections for public officers or for the decision of any question submitted to electors, within this state, shall be printed and distributed at public expense. The printing of ballots and cards of instruction for the voters in each county, and the delivery of the same to the election officers as hereinafter provided, shall be a county charge, the payment of which shall be provided for in the same manner as the payment of other county expenses, but the expense of printing and delivering ballots and cards of instruction to be used in municipal elections shall be a charge upon the city or town in which such elections shall be held."

Sec. 13.—" All certificates of nomination which are in apparent conformity with the provisions of this act, shall be deemed to be valid, unless objection thereto shall be duly made in writing within three days after the filing of the same. In case such objection is made, notice thereof shall forthwith be mailed to all candidates who may be affected thereby, addressed to them at their respective post-office addresses, if any, or place of residence, as given in the certificate of nomination. The officer with whom the original certificate was filed, shall pass upon the validity of such objection and his decision shall be final; *Provided,* Such officer shall decide such objection within at least forty-eight hours after the same is filed, and any objection sustained may be remedied or defect cured upon the original certificate, or by an amendment there-

to, or by filing a new certificate within three days after such objection is sustained."

Sec. 18.—" * * * Upon each ballot, commencing not less than two inches below the bottom line of the duplicate stub, shall be printed the caption and device, if any, with the name thereunder of each office to be filled at the then ensuing election, and the name or names of such candidates therefor, respectively, as may have been certified therefor in the certificates hereinabove mentioned.    Each set of nominations shall be arranged in a list running lengthwise of the ballot, with the appropriate designation of the political party, committee, or persons making such nominations as set forth in the certificate thereof; and it shall be lawful to designate each or any set of nominations in the certificate thereof, and upon the ballots, by an appropriate emblem or design, such as a flag, eagle, rooster or other device, as may be set forth in the certificate of nomination ; *Provided*, No two sets of nominations shall have the same device therein, and each political party shall have the prior right to use the device used by it at the last previous general election.    Each set of nominations shall be arranged on such ballot, side by side, lengthwise, with the name of each office in each set of nominations in a parallel line and just above the name of the candidate for such office, and when there is no nominee in any particular set of nominations, a blank shall be left under said office. * * * "

Sec. 20.—" Whenever it shall appear by affidavit of a candidate, or his agent, that an error or omission has occurred in the publication of the names or description of the candidates nominated for office, or in the printing of the sample or official ballots, the district or county court, or a judge, thereof, either in term time or in vacation, may upon petition of such candidate or his agent, by order require the county clerk, city clerk or town clerk, charged with the duty in respect to which an error or omission has occurred, to forthwith correct such error or to forthwith show cause why such error should not be corrected, costs including a reasonable attorney's fee may be taxed in the discretion of such court or judge, against either

party. The county clerk, city clerk or town clerk, shall also on their own motion, correct without delay, any error in all ballots which he or they may discover, or which shall be brought to his or their attention, and which can be corrected without interfering with the timely distribution of the ballots as herein provided."

Sec. 26.—" On receiving his ballot, the voter shall forthwith and with leaving the enclosed space, retire alone to one of the voting shelves or compartments so provided, and shall prepare his ballot by marking, in ink, in the appropriate margin or place a cross (+) opposite the name of the candidate of his choice for each office to be filled; and in case of a question, submitted to a vote of the people, by marking in the appropriate margin or place a cross (+) against the answer which he desires to give; Provided that where a voter desires to vote for all the nominations included in one set of nominations, instead of marking a cross opposite the name of each candidate, he may mark a cross (+) above such list of nominations, and near to the device, emblem, or design, designating such list of nominations, if such device, emblem or design there be, and such mark shall indicate that the voter cast his ballot for all the nominations in the list under such device. * * * "

Sec. 36.—" Every public officer upon whom any duty is imposed by this act, who violates his said duty, or who neglects or omits to perform the same shall be punished, except as otherwise in this act specially provided, by imprisonment in the county jail for a term not exceeding one year, or by a fine of not less than one hundred dollars, and not more than three thousand dollars, or by both such fine and imprisonment. * * * "

Mr. H. B. Johnson and Mr. H. N. Hayes, for contestor.

Mr. Chas. L. Allen, *pro se.*

Messrs. Riddell, Starkweather & Dixon, for contestee.

CHIEF JUSTICE HAYT delivered the opinion of the court.

This is the first contest instituted in this court under the new election law —"The Australian Ballot System." Questions affecting the freedom and purity of elections are of vital importance under our system of government. While the present contest is important to the contestants and the people of the Thirteenth judicial district, it is of still greater importance on account of its effect upon the cause of ballot reform.

It is to be noted at the outset that in common parlance "The Australian Ballot System" is a name applied indiscriminately, in enactments of different states, widely dissimilar in many important particulars, so that with us the name is of little significance. It is doubtful if any state has yet, or will in the future. adopt without change "The Australian Ballot Law," as it is found in the island of its birth. Some of its essential features have been discarded no doubt as inapplicable to our institutions and theory of government. The act under which this contest must be determined contains 44 sections. It will only be necessary, however, to refer to a few of these sections in this opinion. By the first section provision is made for printing and distributing all ballots by public officers at public expense. Sec. 2 excepts certain school and special elections from the requirements of the first section. Sections 3 to 12 inclusive provide in detail the manner of making, certifying and publishing nominations. Sec. 13 provides the mode in which objections to certificates of nominations may be made and determined, and also provides how defects in such certificates may be cured. Sec. 14 relates to acceptances of nominations, while by the next section provision is made for filling vacancies in nominations.

Turning to the complaint we find that paragraphs 12 to 15 inclusive, against which (and paragraphs 16 to 17) this motion to strike is interposed, relate exclusively to the manner in which certain candidates were nominated and their names published, and the way in which Glynn's name was placed upon certain tickets. Paragraphs 16 to 17 have refer-

ence to the number of legal votes received and registered. If the allegations contained in these latter paragraphs are to be taken as true, then it appears that contestant received a majority of all the legal votes cast. It is probable these paragraphs were included in the motion to strike out by mistake. The allegations appear to be legal and proper, and so far as the motion applies to them it will be overruled without further comment. That part of the motion which is directed to paragraphs 12 to 15, inclusive, raises the principal question upon which we are called to pass at this time. It is alleged in substance in these paragraphs that contestee, Glynn, was originally nominated by 100 independent voters of the district. These independents selected as the name by which they were to be designated, "Peoples' Party" and adopted the device or design, "Emblem of Justice." That one Quitman Brown was nominated as a candidate for district attorney by the same persons and at the same time. The certificate of these nominations was duly filed in the office of the secretary of state. Some time after this had been done five hundred, or more, independent voters, residing principally in Arapahoe county, and none of them in the Thirteenth judicial district, placed in nomination a candidate for justice of the supreme court, and selected as their name "The Peoples' Party for Colorado," and as their emblem or device, "Cottage Home." A certificate of this nomination was duly filed in the office of the secretary of state.

Neither the contestee, nor his associate, Brown, accepted the first nomination as required by law. To remedy this omission certain persons, chosen by the original convention to fill vacancies, selected contestee and said Brown for the offices of district judge and district attorney, respectively, and the candidates having accepted, their names were certified by the secretary of state to the several county clerks as thus duly nominated. In four of the five counties of the district there was no printed notice given by any newspaper or publication advising the electors of the nomination of either contestee or his associate. In the fifth county, this

being the county of Washington, their nominations were published under the device, " Emblem of Justice," as a separate set of nominations. In this county official ballots were printed containing four columns or sets of nominations, viz.: *First*, the Republican list under the device "Eagle," containing the name of contestor; *second*, the democratic list under the device " Rooster," containing the name of William T. Skelton ; *third*, a list designated as " Peoples' Party," under the device " Cottage Home," containing the name of a candidate for supreme judge only ; *fourth*, a list also designated, " Peoples' Party, " under the device, " Emblem of Justice," containing the name of contestee and others. In the remaining counties of the district the official ballots were printed with three parallel columns; the first and second containing the republican and democratic list, respectively, and the third, designated " Peoples' Party," under the device " Cottage Home," containing the name of John H. Croxton for supreme judge, contestee for district judge, Quitman Brown for district attorney, and other candidates.

It is claimed that about 150 ballots in said four counties, of which 100 were in the county of Yuma, were erroneously counted, certified and returned as votes cast for contestee for the office of judge of the Thirteenth judicial district. That said ballots were marked by said electors at said election only by a cross in ink, under the device, " Cottage Home."

That there was no other mark to indicate that said voters desired to vote for contestee. That all the other ballots which were counted, certified and returned for contestee were marked by a cross against his name, as printed under the device, " Cottage Home," and not under the emblem or device " The Emblem of Justice," as was the case with the county of Washington. It is futher alleged that the state board of canvassers certified as the result of the returns submitted to them that contestee received a plurality of two votes.

The position of contestor with reference to the 150 ballots with the device " Cottage Home," is that said ballots should not have been counted for contestee, since under the law it is

claimed that there was no possible way of voting for him except by placing a cross near the device " Emblem of Justice," or by a cross to the right of his name. If this position can be maintained, it follows that contestor is shown to have been elected regardless of those allegations of the complaint which relate to certain other alleged irregularities.

In support of the position taken by contestor our attention is directed to the provisions of section 18 of the act.

The arguments based upon this section being that the nominations of Glynn and Brown constituted a single set of nominations. That the persons who filed the certificate selected a name and also a device and nominated a candidate for district judge, and a candidate for district attorney, and no other candidates. While those who placed in nomination John H. Croxton selected a different device and a different name, both said device and name being quite dissimilar from that selected by the Glynn and Brown convention.

It is said that there is absolutely nothing in the statute which justified the placing of the name of Glynn or Brown in the list or set of nominations with the name of John H. Croxton under the device " Cottage Home." The argument further proceeds to assume that for the purpose of preventing the putting in one list of nominations for different offices made at different times and by different persons not connected by party ties, the statute expressly provided when there is no nominee of any party, or set of nominations, a blank shall be left under said office. It is said, therefore, that under the device " Cottage Home " and under the name of John H. Croxton as candidate for supreme judge a blank should have been left for district judge and for district attorney, no nominations having been made for either of said offices by the persons who nominated John H. Croxton or by any persons who selected the device " Cottage Home."

If the contention of counsel be correct and if it be admitted that these names were improperly printed upon certain ballots, does it follow that such ballots, after having been

voted, should not be counted for the person for whom they were cast?

An examination of the statute shows that provisions for the correction of certain defects and irregularities are therein made. By section 13 of the act it is provided that certificates shall be deemed valid unless written objection be filed within a time fixed, and that when such objections are filed the candidates shall be notified of the same. It further provides that the officer with whom the certificate is filed shall pass upon the validity of the objection made, and that his decision shall be final. And in case any objection shall be sustained the certificates may be amended or a new certificate filed.

In considering this phase of the present controversy we have to do more particularly with another section, and refer to section 13 merely for the purpose of showing the liberal tenor of the act, so far as the voter is concerned. In section 20 it is provided that whenever it shall appear by affidavit of a candidate or his agent that an error or omission has occurred in the publication of the names or description of candidates nominated for office or in the printing of the sample or official ballots, the district or county court may correct such error. By this section it is further provided that the county clerk, city clerk, or town clerk, as the case may be, may, on his own motion correct, without delay, any error in all ballots which he or they may discover, or which shall be brought to his notice and which can be corrected without interfering with the timely distribution of the ballots. By other sections it is provided that the name of every candidate, whose name has been properly certified, shall be on one and the same ballot; that sample ballots shall be in the county clerk's possession seven days before election, subject to public inspection, and official ballots four days before election. It is also provided for posting of sample ballots, etc.

An examination of these sections will show that the legislature has made ample provision for the correction of ballots prior to the election. And it would seem to be the duty of

candidates to make such objections in seasonable time. It is believed that it would not be in the interests of a fair expression of the will of the people to allow a candidate to lie by and not point out such objections as he may have to the form of the ballot until after the election has been held. If this be true contestor should have spoken before the election. The fundamental object of all election laws is the freedom and purity of the ballot. It is to be observed that the voter has no control whatever over the publication of the names of candidates or the form of the ballots. If, for some defect in these particulars, the ballot must be rejected the door would be open to fraud. To defeat the will of the people it would only be necessary to have the county clerk furnish the electors, or some of them, with tickets slightly variant from those prescribed by law. It would seem to be the purpose of this section to give the opposing candidate ample opportunity to see that his opponent's name was not upon an unauthorized ticket, or under a device to the use of which he was not entitled. We do not think that those decisions which have been cited, holding that all provisions of the statutes are mandatory, and that ballots should be rejected that are not in all particulars in conformity to the requirements of the act, are entitled to much weight in view of the provisions of this act. In order to make such decisions controlling it should appear that the provision for objection and amendment was equally as liberal in those states as under our statute. It may be said that all provisions of such laws are mandatory in the sense that they place a duty upon those who come within their terms. But it does not follow that an election should be invalidated because of every departure on the part of public officers from the terms of the act. *Bowers v. Smith*, 17 S. W. Rep. 761. We do not feel at liberty to place a narrow construction upon this act. To overthrow the expressed will of a large number of voters for no fault of theirs, as we are asked to do, would be to defeat the purpose of all election laws, which is to obtain a full

and fair expression of the wishes of the voters. *Kellogg v. Hickman*, 12 Colo. 256.

Something is predicated upon the fact that certain voters put a cross opposite the name of Glynn upon the tickets claimed to be irregular. This was necessary under the statute whenever a voter did not wish to vote for all the names in a particular set of "nominations."

If he desired to vote the entire ticket it was only necessary for him to put a cross near the emblem, but if there was the name of a single candidate he did not wish to vote for, included in the list, he was practically compelled to check the name of every candidate voted for in order that his ballot might not be counted for the candidate falling under his displeasure. It affirmatively appears from this petition that all tickets voted had printed thereon in parallel columns the names of Glynn, Allen and Skelton. Now, if the voters, by putting a cross near the emblem upon the Peoples' ticket, did not thereby intend to vote for all the candidates whose names were beneath, including Glynn's, we would certainly have found a cross opposite the name of the opposing candidates, Allen or Skelton, according as the choice of the voter may have fallen upon the one or the other of these. It is certainly unreasonable to suppose, as the argument assumes, that voters to the number of 150 did not wish to vote for any candidate for this important office.

There is no basis for any claim of fraudulent intent on the part of the county clerks or either of them; on the contrary, it appears that Glynn was put in nomination by an independent party, and that he ran against the nominees of both of the old parties, to which parties the clerks owed allegiance. For failure to publish the names of candidates as required and for violations of the statute with reference to the printing of tickets, severe penalties are prescribed by the act. Under these circumstances we do not believe that the court would be justified in rejecting these 150 ballots because of the failure of the county clerks to make the proper publication, or for the reason that they improperly printed the name of con-

testee under the device "Cottage Home." The case of *Bowers v. Smith, supra*, is strictly in point. In that case the Union Labor party, not having polled the requisite vote in the next preceding election, was not entitled as a party to put a ticket in the field. A ticket having been nominated, however, duly certified, and ballots printed and furnished to voters with such nominations, the court held that objection, because of insufficiency of votes at the previous election, must be made before such ballots were polled and not afterward.

There is but one other matter reached by this motion. It is alleged in the complaint that the contestor was duly appointed to the office of district judge by the governor, and that he was the qualified and acting district judge at the time contestee assumed to discharge the duties of said office. This being an election contest pure and simple, and not a proceeding in the nature of *quo warranto* under the code, no question as to contestor Allen's right to hold over under the original appointment can be considered. And for the reasons already given, paragraphs 12 to 15, inclusive, will be stricken out. Paragraphs 16 to 17 being properly in the complaint the motion as to these paragraphs will be overruled.

Mr. JUSTICE HELM (dissenting).

It is only after the most careful examination that I venture to differ from my associates upon the leading question considered in the foregoing opinion. And I would content myself with a mere declaration of dissent were it not for the fundamental importance and far-reaching effect of the views promulgated. The vital necessity to good government for legislation in the direction of ballot reform, is a matter of such universal recognition that a discussion of the subject would be a waste of words. The people of this state, through their last legislature, undertook to purge our elections of the demoralizing and disgraceful features that have too often characterized them. The purpose of the election

statute thus adopted is to secure a free and honest expression through the ballot of the electors' wishes. This statute is designed *to prevent the perpetration of frauds upon the voter in casting his vote,* as well as to do away with antecedent bribery and other improper influences, together with subsequent frauds in the count and return. Legislation which has for its object the accomplishment of either of these ends is firmly grounded upon the bed-rock of public policy and necessity. This kind of legislation is therefore peculiarly entitled to such judicial construction as will effectuate its purpose unless sound legal principles imperatively forbid.

Among the various devices resorted to for the purpose of defeating the real will of the voter, perhaps none have in the past been more successful than that of printing and circulating at the polls tickets corresponding in form and appearance to those adopted by a particular political party, but containing one or more names of opposing candidates instead of the regular party nominees. In cities especially, where many electors are congregated, comparatively few even know the names of all the candidates nominated by their respective parties. They go to the polls intending to vote " straight tickets ; " that is, to vote for all the regular nominees of the political organizations to which they render allegiance. But by the device mentioned hundreds of voters were deceived, and without their knowledge or consent made to cast ballots for candidates representing opposing political principles. The evil in this respect became so great that years ago the legislature was forced to recognize it, and did so by adopting legislation looking to its suppression. In enacting the ballot law of 1891 the general assembly, by the provisions involved in this discussion, sought to preserve what had been gained in the direction of this particular reform.

Those provisions require that all lists of nominations regularly made and certified, whether by convention or by petition, shall be printed in separate columns upon a single ballot; *also, that when no candidate is selected for a given office a blank shall be left upon the ballot under the name of the office.*

It authorizes the adoption by the convention or by the petitioners, as the case may be, of a device or emblem to represent each list of nominations. And when an emblem is thus selected, it commands the printing thereof upon the ballot at the head of the list of nominations it is chosen to represent.

The act then prescribes two methods of expressing the voter's preference upon his ballot. He may place a mark or cross opposite the emblem at the head of a particular list of candidates, or in lieu thereof he may place checks opposite the names of all candidates for whom he desires to vote, no matter upon what lists these names appear. If he chooses the former method and places a cross opposite the emblem, he thereby signifies his intention of voting for the entire list lawfully printed beneath the emblem, and his vote is so counted. The statute guarantees to him that every name on that list represents a candidate regularly chosen by his party, or by the petitioners with whom he desires to affiliate in that particular election. If democratic in principle, he has a right to rely upon the fact that the names of candidates found on the ticket under the title "democratic party" and under the emblem adopted by that party, are the regular nominees of the party. Every line of the statute bearing upon the subject sanctions this view. But if, despite such a disregard of the law, as is alleged in this case, the vote can be effective, the statute upon which the voter relies is grossly misleading and becomes potent in accomplishing a dangerous and wicked deception. If he may not depend upon the truthfulness of the ballot in this respect, this feature of the law cannot be too soon abrogated.

The placing of different sets of nominations in separate columns on the ticket and the emblem device were not features of the original Australian ballot system; nor are these provisions found in all the states which have enacted that system in substance. Strong considerations commend the wisdom of this addition to the original law. But whether it be wise or unwise is a legislative and not a judicial question. The courts must enforce the provisions, if valid, as

they find them.   And such a view should be taken, if possible, as tends to promote and not to defeat their evident purpose.

The averments of the petition stricken out by the opinion of the court plead substantially the following, among other facts, viz.: That in four of the five counties of the Thirteenth judicial district the name of contestee, a candidate for the office of district judge, was printed upon a list of nominations and under an emblem where it did not belong; and that electors placing a cross opposite the emblem were by this means deceived, and upward of one hundred votes in one of these counties alone were fraudulently obtained and counted for him; his apparent majority in the entire district upon the official count being only two.   It is not alleged that contestee affirmatively perpetrated or connived at the illegal proceeding, and so far as the averments are concerned, there may perhaps have been no premeditated and intentional wrong.   *There was nevertheless a fraud in law which tended to and probably did deceive voters.*

That contestee was the candidate of certain petitioners who chose the name " Peoples' Party" and a device called " The Emblem of Justice," while the list in which his name was illegally printed was headed " Peoples' Party," under the emblem " Cottage Home," coupled with the further fact that the petitioners, styling themselves the " Peoples' Party of Colorado, "who adopted the emblem " Cottage Home " and in whose list his name was printed, made no nomination for the office of district judge of the Thirteenth district, are matters of no significance whatever so far as this discussion is concerned.   Two different sets of petitioners, meeting at different times and places, selected different party names and emblems, and named different candidates for different offices. Political associations casting ten per cent of the votes at the last preceding election are treated by the statute as organized parties; but the statute recognizes no political or party affiliation whatever between the signers of different petitions.   The case should be considered precisely as if the

illegality had resulted from placing the name of a republican nominee in the list of democratic candidates and under the democratic emblem ; or by inserting the name of a " prohibition " nominee by petition, in a list of " Peoples' Party " candidates also named by petition and under the " Peoples' Party " emblem.   And the principle involved would be in nowise different if the name thus illegally placed in the wrong list were substituted for that of a regular nominee, instead of filling a space which the statute imperatively commands *to be left vacant.*

Such illegal acts, whether intentional or unintentional, as are here detailed will, if tolerated, open wide the very door to fraud the legislature sought to close.   Not only is the candidate who might otherwise be chosen cheated out of his election, but above and beyond this circumstance and of vastly greater public importance, is the consideration that by this means this honest voter himself is also grossly defrauded.   I do not forget that the opinion of the court assumes that the conclusion there reached tends to promote the interests of the voter.   The reason given for the assumption is that under a different view " to defeat the will of the people, it would be only necessary to have the county clerk furnish the electors or some of them with tickets slightly variant from those prescribed by law."   With all due respect to the learning of my worthy and able associates, I ask what is " the will of the people," and how is that will disclosed ?   I contend that when the voter either by fraud or negligence is led to vote for a candidate he does not intend to favor, his will is not declared ; on the contrary, that his vote is made to express a choice directly in conflict with his will.   Neither does it follow that if my position in this regard be maintained, all tickets " slightly variant from those prescribed by law " would be thrown out.   There are doubtless minor directions in the statute which are not so mandatory as that a non-compliance therewith will in contests after the vote has, without objections, been cast and counted, require that such vote be disregarded. . But it is clear that the subject with which we are

now dealing does not constitute one of these minor features. I consider it entirely superfluous to argue or to cite authority upon the proposition that the statutory provisions under consideration are mandatory; if these provisions be not vital as well as mandatory, it would be difficult to name any portion of the act that is. The voters of Yuma county who were, according to the allegation, deceived and defrauded might justly, if the remedy were appropriate, now appear with contestor before this court demanding a vindication of their rights also under the law.

In this connection, I desire to emphasize the fact that the entire ballot would not be rejected. When the voter has declared his intent by placing a mark near the emblem, his vote counts for all the names properly on the list beneath that emblem. Each and every candidate for whom he intended to vote receives the full benefit of his ballot. His action is only disregarded as to the name illegally printed in the list; the name of a candidate for whom *the legal presumption obtains, in view of the statute,* that he did not intend to vote. No vote intentionally given is thrown out. The court simply refuses to count a vote the elector did not intend to cast.

The argument that a legal fraud was perpetrated upon the 150 voters who placed crosses opposite the " Cottage Home " emblem does not assume, as the opinion suggests it does, that these voters did not intend to vote for a candidate for district judge. This argument, as I understand and have endeavored to state it, simply assumes in accordance with the intent of the law, that the voter placing a cross opposite the emblem wishes to cast a straight ballot for all the regular party or petition nominees, and that he does not wish to support a candidate whose name is surreptitiously and illegally placed in the wrong list. Besides, it is certainly less unreasonable to suppose, if suppositions of fact are to be indulged, that some of these 150 voters were actually deceived by the placing of contestee's name in the wrong list, than to suppose that all of them fully understood the actual facts and intended to favor him. But if three of the total 150 were

thus deceived and if legal notice be now taken of the fraud, contestee's election is defeated. Somewhat corroborating the latter supposition of fact is the averment of the petition that each and every of the remaining 660 votes counted for contestee in the four counties where the official ballots were illegally printed were given by placing a mark or cross *opposite his name.* While there is nothing conclusive in these figures, they tend to show that the voters *who thought of him and intended to vote for him* did not risk a cross opposite the emblem. There is no necessity for commenting at the present time upon the result where the name of a candidate is printed in the wrong list, but where the voter nevertheless indicates his purpose to favor such candidate by placing a check beside his name.

The opinion filed does not deny the fact that contestee's name was illegally printed in a list of names and under an emblem where it did not belong. But it is claimed that because contestor did not have the official ballot in the four counties where the illegality existed corrected before the election, he should not now be heard to complain. That is to say, the opinion in effect holds that the duty is imposed upon each and every candidate for office not only to see that his own name is correctly printed in the proper list, but also to see that his opponent's name is not fraudulently, ignorantly or negligently placed in the wrong column. A candidate for office on the state ticket must at his peril see that in every one of the fifty-five counties of the state no illegality of this kind in favor of his opponent exists.

Waiving for a moment the important consideration of fraud upon voters, I observe that such a burden should not be imposed upon the candidates, unless it be sanctioned by plain statutory authority. For this authority reference is made to sections 17 and 20 of the election statute. Section 17, among other things, provides for the preparation of sample official ballots by the county clerk in each county, which are kept subject to inspection during seven days preceding the election. By section 20 provision is made that a candi-

date, or his agent, may have any "error or omission" in the official ballot corrected; it is also made the duty of the county clerk on his own motion to rectify any imperfections he may himself discover or that may otherwise be brought to his attention. Upon these provisions alone is reliance placed for the declaration in effect that because contestor did not discover and complain of the illegality before the election he has waived the right to be now heard.

. Undoubtedly, a candidate who discovers by means of the sample ballot thus exhibited, that his opponent's name is through mistake or fraud printed in a list where it should not be, may object and have a proper correction made. But I find no intimation that if he fails to discover the "error or omission" whereby such a wrong upon himself and the voter is perpetrated, he shall be held to have waived the objection. If the legislature had intended the latter result to follow, such intent would have been plainly expressed. This observation is founded upon a well known rule of construction, and its present applicability is vindicated by the language employed in a preceding provision of the same act. Section 13 declares that "all certificates of nomination which are in apparent conformity with the provisions of this act, *shall be deemed to be valid unless objection thereto shall be duly made in writing within three days after the filing of the same.*" It then provides the procedure for investigating such objections, and also for curing defects. It thus appears that the precaution was taken by the framers of the laws to state that a waiver should follow the omission to interpose timely written objections to certificates of nominations; and this precaution relates to a matter obviously of far less importance than the careful, accurate and honest preparation of official ballots.

The opinion filed strongly relies upon the case of *Bowers v. Smith*, 17 S. W. Rep. 761. That case is radically different from the case at bar. Three lists of candidates named respectively, "democratic," "republican" and "union labor" were printed upon the official ballot in the city of Sedalia,

Missouri. No question relating to emblems arose. There was no pretense that the name of contestee was illegally printed in a list where it did not belong. There was no contention that voters were induced to support men not their choice. The position taken by contestor was that since the "union labor" party did not cast the requisite three per cent of the votes polled at the preceding election, it was not authorized as a party to name any list of candidates whatever. And that because it did name a list of candidates and that list was printed upon the official ballot, *the entire vote was rendered void. The effort was not to have the votes for a "union labor" candidate rejected;* the contention was that all the votes polled in the city, democratic and republican as well as union labor, should be thrown out. Unless this were done, contestor gained nothing, because contestee was his republican, not his union labor opponent. The fact and circumstances thus presented and the contention thus made, are so radically different from the facts and contention with which we have to deal that it is obvious the reasoning of the court in that case should not be here applied. Moreover, that opinion limits the rule of waiver announced, to objections "to the presence on the official ballot of names not properly entitled to be there," disclaiming any intimation as to the result had the name of a candidate been omitted from that ballot; and it might, in my judgment, with equal propriety have extended the disclaimer to cases where names that belong on the official ballot are illegally placed in a list of candidates nominated by another party. I believe that the supreme court of Missouri if confronted with the identical question now before us would not employ the reasoning or reach the conclusion stated in its opinion. It may also be a matter of some significance that the constitution of Missouri does not as does ours command the legislature to "pass laws to secure the purity of elections, and guard against abuses of the elective franchise." Sec. 11, art. 7.

Neither has the case of *Kellogg v. Hickman*, 12 Colo. 256,

which is also mentioned in the opinion filed, any resemblance in principle to the case at bar. The question there presented was simply whether, under the former law, certain ballots cast and counted for respondent should be disregarded in the election contest solely because they were printed on " pale yellow paper, three and three fourths inches wide," when the statute prescribed " plain white paper not more than two and one half inches wide." It appears that the pale yellow paper happened to be the only kind conveniently obtainable. No intentional fraud was charged in connection with the preparation of the ballots, *nor was it claimed that any voter could have thus been deceived and led to cast a ballot in favor of a candidate for whom he did not intend to vote*. A majority of the court in that case held that though the law regarding ballots was not strictly complied with, yet the returns in question should not be rejected in the election contest. Persuasive as are some of the legal objections to a recognition of ballots not prepared in accordance with law, it cannot be denied that the ruling of the court in that instance tended to the enforcement of the will of the voters casting the yellow ballots; but the view of the court in this instance tends, as I have tried to show, to defeat the will of the voters casting the particular ballots challenged. There, a ballot prepared not in accordance with law but which could not in any way have deceived the voter was voted; here, the very essence of the contention, as I understand it, is that the ballot as prepared was calculated to and did deceive the voter.

The preparation of official ballots by public officers is an important feature of the new act. It is strictly in line with the legislative endeavor otherwise shown by the act to prevent fraud and deception upon the voter. The trouble and expense thus incurred will be vastly more than compensated by the result, provided the law in this regard be intelligently and honestly executed. But when the statutory directions are disobeyed; when either dishonestly or negligently illegal ballots are prepared; and when such disobedience and illegality result in deceiving the voter, the beneficent legislative

design is nullified. I cannot believe that the will of the legislature can be thus defied and the interests of the voter be thus sacrificed with impunity. To say that because the government has undertaken to prepare a ballot for the voter's use, though through disobedience of law this ballot becomes an instrument of fraud he shall have no redress, and the candidate fraudulently benefited shall reap the fruits of the fraud would, in my judgment, be a most impotent and indefensible conclusion.

The opinion of the court mentions provisions relating to the punishment of officers charged with misconduct in the preparation of ballots and the conducting of elections. Such provisions there are, and the statute would indeed be weak without them. But they are not sufficient. They were not intended or expected to redress wrong like the one now charged; their office is to prevent a perpetration of the wrong and to prevent its repetition if perpetrated. The punishment of an officer who ignorantly or dishonestly connives at the preparation of a fraudulent ballot while the party in whose interest the fraud is perpetrated reaps the benefit thereof, falls short of satisfying the requirements either of justice or law. Such punishment is inadequate satisfaction to the man who would have been lawfully elected but for the fraud; and it is even poorer satisfaction to the voter who has been fraudulently induced to cast a ballot contrary to his intention. I do not think these provisions, always difficult as they are to enforce, will have the effect of averting the injustice and wrong above referred to, and of preventing the opinion filed from practically destroying the usefulness of one of the most important and beneficent features of the statute.

I am not prepared to admit the assertion made in argument, that there is no authority in the statute for a refusal by the judges of election to count votes illegally obtained in the matter here alleged. But if it were true that the judges of election are powerless in this respect and that the law is thus defective, all the greater reason exists for taking notice of the

fraud and neutralizing its result through *quo warranto* or election contest proceedings.

Firmly believing in the correctness of the foregoing views, I can do no less than dissent from the conclusion announced by a majority of the court.

### UPON PETITION FOR A REHEARING.

PER CURIAM. The petition for a rehearing in this case is supported by an able and exhaustive argument which we have carefully considered.

As a result of our examination we are convinced of the correctness of the views announced in the original opinion, and of the result then reached.

Counsel insist that "150 ballots" should not be counted for Glynn because of the errors of the public officers charged with the duty of providing the ballots. These errors, without doubt, arose from the fact that "The Peoples' Party" in the 13th judicial district selected a different emblem from the one chosen by the state convention of the "Peoples' Party for Colorado," and the county clerks, through inadvertence, caused the official tickets to be printed without reference to such different emblems.

Is it possible that by any refinement of reasoning this position of counsel can be shown to be right,—that the ballots of 150 legal voters can be rejected for what, at most, are but irregularities on the part of public officials, and the expressed will of the voters of the district be thereby thwarted?

In speaking of this action of the clerks as an irregularity, merely, we do so advisedly. For aside from the distinction attempted to be drawn between the name "The Peoples' Party" and "The Peoples' Party for Colorado" the only reason assigned for the rejection of these ballots is that the name of Glynn was printed and voted under a device to the use of which he was not entitled. As to the first objection, it is apparent that both conventions were conventions of the "Peoples' Party" and the addition of the words "for Colorado" in the one instance is quite immaterial. And as to

the difference in the emblems or devices chosen, it is not clear that Glynn was not as much entitled to have his name printed under the one chosen by the state convention and adopted by the majority of the county clerks, as under the one selected by the convention held in the 13th judicial district. Counsel say that since the year 1883 ballots with a designated heading containing names not belonging thereon have been denounced as fraudulent, and the counting of such names prohibited by statute; and our attention is called to the following provision:

"When a ballot with a certain designated heading, contains printed thereon in place of another name not found on the regular ballot having such heading, such name shall be regarded by the judges as having been placed thereon for the purpose of fraud, and such ballot shall not be counted for the name so found." Sess. Laws, 1883, p. 187.

It is conceded that this statute was repealed at the last session of the legislature and prior to the time of holding the election under consideration. The repeal furnishes a strong argument against the deduction of counsel, unless it can be shown that some provision similar in effect has been enacted in lieu thereof.

The provision of the new statute relied upon as accomplishing the same result as the former statute is found in section 18 and reads as follows: "when there is no nominee in any particular set of nominations a blank shall be left under said office." This, in our judgment, falls far short of the declaration contained in the repealed statute. It would have been a very simple matter for the legislature to have provided that ballots, like those used in this instance, should not be counted, or that names found in lists where they do not belong should be rejected. This has not been done. Moreover, it has been held that when the wording of a statute has been radically changed, the change of language indicates a change of intent on the part of the legislature. *Heinssen v. State*, 14 Col. 228.

Again, the reason for the repeal of the provision of the

former statute is obvious. At the time of its enactment the printing of tickets was not under the direction of the public officers. Any person might procure tickets to be printed, containing such names and such names only as he chose to have placed thereon. Frequently "mixed tickets" were procured and secretly kept until the day of the election and then substituted for the regular tickets, and the voters, no doubt, often deceived thereby. Under the new law as we have seen, the printing of all tickets is under the direction of public officers.

Moreover, by section 17 of the present act, sample ballots are required to be printed and in the possession of the officers charged with the duty of preparing such ballots seven days before the election, subject to public inspection. Ample provision is also made for the posting of such ballots in each precinct. Under these circumstances the chances for deceiving the voter are reduced to the minimum.

In order to show that in our former opinion we made no unwarrantable deduction from the opinion of the supreme court of Missouri in the case of *Bowers v. Smith*, it is only necessary for us to quote the following passage from the Missouri court:

"It must have been already noted that the questioned act of the county clerk consisted of admitting names to the official ballot, not of excluding any. There is a substantial difference in principle between admitting and excluding such names. Under the latest English act before us, the ruling of such officers, admitting nominees to the official ballot, are declared to be final; but rulings denying such right, when claimed, are subject to review by competent outside authority. The error of the officer, if any there be, is vastly different, in its practical consequences, when he thereby admits another name on the ticket, from his error in rejecting a nominee. In our statute it is provided that 'Whenever it shall appear by affidavit that an error or omission has occurred in the publication of the names or description of candidates nominated for office, or in the printing of the ballots

the circuit court of any county, or the judge thereof in vacation, or if the circuit judge is then absent from the county a judge of the county court, may, upon application by any elector, by order, require the clerk of the county court to correct such error, or to show cause why such error should not be corrected.' Rev. Stats. 1889, § 4778. In accordance with the spirit of the law prevailing in this country respecting popular elections, we think it should be held that where a candidate for public office causes no timely objection to be made, as required by the section quoted, he must be regarded as having waived any objection that may exist to the presence on the official ballots of names not properly entitled to be there."

As to the argument that these views would entail upon each candidate the necessity of visiting each precinct in his territory for the purpose of making an examination of the official ballots, we answer that until there is a decided change the zeal of those holding antagonistic political opinions may be safely relied upon to expose any error in the printing of tickets whereby voters would be liable to be misled. It must be presumed that public officers charged with the conduct of elections will act honestly, and while it may not be possible to provide absolutely against fraud we believe that experience will show that the views heretofore announced will advance the cause of ballot reform in this state.

The petition for a rehearing will be denied.

*Rehearing denied.*

MR. JUSTICE HELM dissenting.