THE PEOPLE EX REL. v. McCLEES ET AL.

1. JURISDICTIONAL WRIT.
The writ of injunction which the constitution authorizes the supreme court to issue in the exercise of its original jurisdiction is a jurisdictional writ as contradistinguished from the ordinary writ of injunction in aid of jurisdiction otherwise acquired.

2. PUBLIC RIGHTS.
To warrant the supreme court in taking jurisdiction in an original proceeding by injunction, the case made by the complaint must not only show equitable ground for relief, but must disclose a question involving the rights or franchises of the state in its sovereign capacity, that is, public rights or interests as contradistinguished from matters of private or individual concern.

3. TITLE TO PUBLIC OFFICES.
Where the supreme court was asked in the exercise of its original jurisdiction to issue a writ of injunction to restrain the secretary of state from delivering certificates of election to certain persons elected *as* district judges, the injunction being asked on the ground that the terms of the incumbents of such judicial offices were not about to expire; *held*, that the real question in controversy was the question of title to public offices between the individual claimants;

that the controversy did not involve the rights or franchises of the people; nor the rights of the state in its sovereign capacity; and so the writ was denied.

*Original Application in this Court for Injunction.*

The complaint is as follows:

" The people of the state of Colorado, ex rel. John A. Bentley, Amos J. Rising, David B. Graham, David V. Burns and James Glynn, who bring this suit for themselves and in behalf of all others similarly situated who may wish to be made parties hereto and join herein and share the expenses hereof, complain of the defendants above named and say :

" That pursuant to the provisions of an act of the general assembly of the state of Colorado approved March 24, 1887, creating the office of one additional judge for the second judicial district, the then acting governor of the state of Colorado appointed the Honorable Platt Rogers to fill said office so created. That thereafter and at the general election held on November 8, 1887, the Honorable Westbrook S. Decker was elected to succeed the Honorable Platt Rogers, and thereafter duly qualified and entered upon the discharge of the duties of said office. That thereafter at a general election held November 6, 1888, the Honorable Westbrook S. Decker was again elected district judge for the second judicial district of Colorado and qualified and held said office until about December 31, 1890, when he resigned the same. That the relator, John A. Bentley, was appointed by the then acting governor of the state to fill the vacancy caused by the resignation of said Westbrook S. Decker, and duly qualified and entered upon the discharge of the duties of said office, and continued to hold and discharge the duties thereof until the general election held in November, 1891, when he was elected to succeed himself, and after such election he duly qualified by filing his oath of office with the secretary of state of the said state of Colorado, and entered upon the discharge of the duties of said office, and is still holding and discharging the duties of the same.

"That pursuant to an act of the general assembly of the state of Colorado approved March 19, 1889, creating two more additional judges for the second judicial district, the then acting governor of the state appointed the Honorable Thomas B. Stuart and the Honorable Oliver B. Liddell to fill the offices so created. That thereafter at the general election held in November, 1889, the relators, Amos J. Rising and David B. Graham, were elected to said offices to succeed the said Thomas B. Stuart and Oliver B. Liddell, and thereafter duly qualified and entered upon the discharge of the duties of said offices and still continue to hold and discharge the duties of the same.

" That thereafter, pursuant to the provisions of an act of the general assembly of the state of Colorado passed April 6, 1891, creating the office of fifth additional judge for the second judicial district, the then acting governor of the state appointed the Honorable Alvin Marsh to said office. That thereafter at the general election held in November, 1891, the relator David V. Burns was elected to fill said office, and in due time was duly qualified by filing his oath of office in the office of secretary of state of said state of Colorado, and entered upon the discharge of the duties of said office, and still continues to hold and discharge the duties of the same. That the convention which nominated said relator nominated him for the ' Long Term,' and so certified the said nomination to the clerk of Arapahoe county.

" That pursuant to the said last mentioned act dividing the state into judicial districts and creating the thirteenth judicial district, which had not theretofore existed, the then acting governor of the state appointed the Honorable Charles L. Allen to fill said office. That at said general election held in November, 1891, the relator James Glynn was elected to the office of district judge of said thirteenth judicial district and duly qualified and entered upon the discharge of the duties of said office, which office he still continues to hold.

" That the defendant Nelson O. McClees was the duly qualified and acting secretary of state of the state of Colorado.

' " That at a convention of the republican party, held on the 8th and 10th days of September, 1894, said convention nominated to fill the offices of judges of the district court in the second judicial district, the Honorable George W. Allen, who had then held the office of district judge of said district for the full term of six years, Owen Edgar LeFevre, Peter Levington Palmer, Frank Thomas Johnson and Calvin Pickering Butler, to succeed the relators John A. Bentley, Amos J. Rising, David B. Graham and David V. Burns.

" That the county central committee, representing said republican county convention, thereafter filed in the office of the clerk of said Arapahoe county a certificate of said nominations, which, in so far as this controversy is concerned, was in the words and figures following, to wit:

" ' STATE OF COLORADO, ⎱ ss.
COUNTY OF ARAPAHOE, ⎰

" ' *County Committee's Certificate of Nominations.*
" ' To COUNTY CLERK:

" ' We certify that a convention of delegates representing the republican party, a party which at the last preceding election polled at least ten per cent of the entire vote in the county of Arapahoe and state of Colorado, was held at the city of Denver, on the 8th and 10th days of September, 1894, for the purpose of nominating candidates for offices to be filled at the next ensuing general election; and that the following nominations were made therefor:

" ' *Office to be filled : Candidates.*
" ' *District Judges.*
" ' GEORGE W. ALLEN.
" ' OWEN EDGAR LEFEVRE.
" ' PETER LEVINGTON PALMER.
" ' FRANK THOMAS JOHNSON.
" ' CALVIN PICKERING BUTLER.
" ' (Signed)   FRANK C. GOUDY,
" ' PHILIP TROUNSTINE,   Presiding Officer of Convention.
" ' Secretary of Convention.'

" That at the general election held on the 6th day of November, 1894, the above named defendants received the majority of all the votes cast by the electors in said district for said offices, and their names have been or will be certified to the secretary of state as having been elected to fill the offices held by the relators now filling the same in said judicial district.

" That at the same election the defendant, Edward E. Armour, received a majority of all the votes cast for said office by the electors of the thirteenth judicial district, and his name has been or will be certified to the secretary of state as having been elected to fill the office held by the relator, James Glynn.

" That the defendant Nelson O. McClees, secretary of state, threatens to and will, if not enjoined by an order issuing out of this honorable court, in case the canvassing board shall declare said other defendants duly elected to said offices, issue to them, and each of them, certificates of election, and as your relators are informed and believe, the said defendants, and each of them, will demand possession of and attempt to assume and discharge the duties of the said respective offices to which they claim to have been elected.

" Wherefore, these relators pray that this honorable court will assume original jurisdiction of this cause to the end that confusion in said offices may be prevented, and that an order may issue out of this court restraining the defendant, Nelson O. McClees, from issuing certificates to the other defendants, or any of them, of election to the said respective offices until such time as this cause can be finally heard and determined by this honorable court.

" They further pray that this court fix a time for the hearing of this cause in the near future, and cause notices to be issued and served upon each of the said defendants of the time of such hearing, and that upon the hearing thereof an injunction may issue out of this honorable court perpetually enjoining the defendant, Nelson O. McClees, from issuing to the other defendants above named, or any of them, certificates

of election to said offices, and also perpetually enjoining the defendants, Owen Edgar LeFevre, Peter Levington Palmer, Frank Thomas Johnson, Calvin Pickering Butler and Edward E. Armour, or either or any of them, from attempting in any manner to interfere with the official discharge of the duties of the several relators, and further from attempting in any manner to discharge the duties of the offices to which they lay claim to have been elected.

" They also pray for such other and further relief as may be proper in the premises."

THE ATTORNEY GENERAL, Mr. V. D. MARKHAM, Mr. WILLARD TELLER, Mr. CALDWELL YEAMAN and Mr. H. B. O'REILLY, for plaintiffs.

Mr. J. H. BROWN and Mr. J. H. BLOOD, for defendants.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

1. Plaintiffs seek to invoke the original jurisdiction of this court to restrain defendants LeFevre, Palmer, Johnson, Butler and Armour from asserting any claim to certain judicial offices, which offices plaintiffs hold for the present by an undisputed title. The following provision of our state constitution is relied on as conferring jurisdiction in the premises upon this court:

" It (the supreme court) shall have power to issue writs of *habeas corpus*, *mandamus*, *quo warranto*, *certiorari*, injunction, and other original and remedial writs, with authority to hear and determine the same." Art. 6, sec. 3.

The first question to be determined is: Are the facts and circumstances stated in the complaint sufficient to warrant this court in taking original jurisdiction of this cause by writ of injunction? The express language of the constitution is that this court has the *power to issue writs of injunction*, as well as the other writs specified, with *authority to hear and determine the same.* This language is apt and pertinent, and

is sufficient to confer original jurisdiction by writ of injunction in a proper case, but it certainly was not designed to authorize this court to take original jurisdiction of *ordinary* suits in equity by granting writs of injunction. The connection in which the word "injunction" is used in the foregoing section of the constitution, indicates that the writ of injunction thus authorized to be issued by this court in the exercise of its original jurisdiction is an extraordinary writ—a jurisdictional writ as contradistinguished from the ordinary writ of injunction issued in aid of jurisdiction otherwise acquired— a *quasi* prerogative writ. The grade or dignity of the writ is indicated by the well known character of its associates in the same section. The maxim, *noscitur a sociis*, applies. See *Wheeler v. N. Colo. I. Co.*, 9 Colo. 248, and authorities there cited.

2. To warrant this court in taking jurisdiction in an original proceeding by injunction, the case made by the complaint must not only show equitable ground for relief, but must disclose a question *publici juris;* the case must be one involving the rights or franchises of the state in its sovereign capacity, that is, public rights or interests as contradistinguished from matters of private or individual concern. This construction of the foregoing constitutional provision was given twenty years ago by the supreme court of Wisconsin, in an able opinion delivered by Chief Justice Ryan, in the case of *The Attorney General v. Railroad Companies*, 35 Wis. 425. That opinion was recently reviewed and emphasized by Mr. Justice Cassoday in the case of *The State ex rel. Lamb v. Cunningham*, 83 Wis. 90. We do not find that the doctrine has ever been departed from in that state. It is to be observed, however, that in the latter case, it was held that the refusal of the attorney general to bring the suit or to consent thereto, would not prevent the supreme court from taking jurisdiction upon the relation of a private citizen in the name of the state. Mr. Justice Winslow dissented from such view.

3. Counsel for plaintiffs cite and rely upon the case of *The State ex rel. Attorney General v. Cunningham*, 81 Wis.

440, in which the same constitutional provision was construed. In that case the supreme court of Wisconsin was asked to ·issue a writ of injunction to restrain the secretary of state from giving or publishing notices for the election of members of the legislature under a certain "act to apportion the state into senate and assembly districts," which act, it was contended, was unconstitutional and void. Upon motion, in the nature of a demurrer to the complaint, elaborate opinions were delivered sustaining the jurisdiction of the court, holding the apportionment act unconstitutional, and holding, further, that the supreme court had the power by injunction in such original proceeding to control the action of the secretary of state. See, also, *Giddings v. Secretary of State*, 93 Mich. 1.

It is not difficult to distinguish between the Wisconsin case and the one now presented. The Wisconsin case was brought to test the constitutionality of an act under which an election of representatives was about to be held. The act, if carried into effect, would infringe the rights of the people to representation, according to the constitutional rule of apportionment. Thus their most cherished rights and franchises were threatened, and the legality of the legislative department of the government itself was seriously menaced. The present case does not challenge the constitutionality of any legislative act; it does not involve the legality of the judicial department of the state, nor of any judicial district, nor of any judgeship therein. It involves simply the question : What persons will be entitled to occupy certain positions as district judges on and after the second Tuesday of January next? It is not a question of the existence or essential organization of the judiciary; the judicial positions in question exist; they must be filled by persons having the constitutional qualifications. The sole question is : What particular persons will be thus entitled to hold such offices on and after January 8, 1895? In others words : Do the official terms of Judges Bentley, Rising, Graham, Burns and Glynn expire on that day, or do they continue for the period

of six years from the time they were elected respectively?
To determine this question there must be a construction of
certain provisions of the judiciary article of the constitution.
The validity of the legislative acts creating the additional
district and additional judgeships is not questioned. The
acts of a judge *de facto* of a court *de jure* are valid. *In Re
Manning,* 139 U. S. 504.

In the Wisconsin case the election had not been held, nor
even called; therefore, no individual claims to office had
arisen. In the present case the election has been held, and
it is conceded that the defendants LeFevre, Palmer, John-
son, Butler and Armour each received a majority of the
votes of their respective districts, and that the official can-
vass will show such result. The question, then, of the title
to these respective offices on and after January 8th *proximo*,
is the real question in controversy. This is a question of pure
legal right. In no sense can the question be regarded as one
of equitable cognizance, even between the rival claimants;
nor have the people of the state or of the particular judicial
districts any *equity* in the controversy, even in the broadest
sense of the term, except as all good citizens have an inter-
est that the law shall be correctly applied. No rights or
franchises of the people are assailed; each of the rival claim-
ants, old and new, has been chosen by the people. The vital
question is, for what period of time, respectively, were the
present incumbents thus chosen? Their title at present is
good and unassailed; but what is its duration? This ques-
tion, when properly presented, must be determined as other
questions of title to public offices are determined. *Neiser v.
Thomas,* 99 Mo. 224; *Dickey v. Reed,* 78 Ill. 261.

The 81 Wisconsin case reviews a large number of cases,
none of which, however, when carefully considered, militate
against the view we have taken. In this connection it is
proper to say that we are advised that the *mandamus* case
referred to at page 476 of the opinion, and of which it is
said the court "recently assumed jurisdiction," was discon-
tinued without an opinion.

It is strongly insisted that injunction is an appropriate remedy in this case. One line of argument is that writs of *mandamus* and writs of injunction are the converse or reciprocal of each other; that the former commands action, while the latter restrains; and it is assumed, inasmuch as a writ of *mandamus* will lie to compel an officer to perform an act which the law specially enjoins as a duty resulting from his office, that, therefore, the writ of injunction is always an appropriate remedy to restrain an officer from the performance of an act which the law does not enjoin as a duty resulting from his office. This reasoning is correct in many cases, but not in all. For example: A subordinate court may, under certain circumstances, be compelled by *mandamus*, in the nature of a writ of *procedendo ad judicium*, to proceed to judgment; but it is difficult to conceive of a case where a writ of injunction may be employed to restrain a subordinate court from rendering judgment, even though it is made to appear that judgment should not be rendered. Writs of *certiorari*, or of prohibition, may sometimes be employed to regulate or restrain subordinate courts in the exercise of their jurisdiction; but as a rule a defeated party, feeling himself aggrieved by the rendition of a judgment, is left to his remedy by appeal or writ of error. So, in the present controversy, it may be that either of the several defendants would be entitled to *mandamus* to compel the secretary of state to issue his certificate of election, so that he may have the proper *indicia* with which to qualify, and assume the duties of his office. But it does not follow that the secretary may be restrained from the issuance of such certificate, even though the election was unlawful; on the contrary, the secretary should not be interfered with in issuing the certificate; but such defendant, having received his certificate, should be allowed to have the title to the office determined by a proper legal proceeding. *Smith v. Myers*, 109 Ind. 1; *Kemp v. Ventulett*, 58 Ga. 419; *Cochran v. McCleary*, 22 Ia. 75.

The case of *The People ex rel. Kelly v. Common Council of Brooklyn*, 77 N. Y. 503, is much relied on by counsel for

plaintiffs. The charter of Brooklyn provided that "no alderman shall, during the term for which he is elected, hold any other public office except that of notary public or commissioner of deeds," and declares that "if any alderman elected" under its provisions "shall be appointed or elected to and accepts such public office * * * after his election or during his term of office as such alderman, his office as alderman shall immediately become vacant and his place shall be filled by a special election to be ordered within thirty days thereafter by the common council to be held by electors of the ward in which he shall have been elected."

The admitted facts were that Daniel O'Reilly was in November, 1877, elected alderman from the 12th ward; that while he was such alderman, and in November, 1878, he was elected a representative in congress for the second congressional district of New York; that he accepted the office on March 18, 1879, and entered upon the discharge of the duties of congressman. Upon these admitted facts a writ of *mandamus* was awarded commanding the common council to order a special election to fill the vacancy occasioned by O'Reilly's election and acceptance of "another public office." But the case was commenced in a court of original, not of appellate, jurisdiction, though it was afterwards affirmed by the court of appeals, the highest appellate tribunal of that state. The principal question discussed by the opinion in the Brooklyn case was not the propriety of the remedy, but whether the office of representative in congress was such "other public office" as was contemplated by the city charter. It was finally held to be such an office as caused a vacancy in the office of alderman. It will be observed, too, that the writ was *mandamus*, not injunction. The granting of the writ did not necessarily preclude O'Reilly from contesting the validity of the election in a proceeding to which he himself should be a party.

In argument we were urged to assume jurisdiction in order to prevent an unseemly wrangle between contesting claimants to judicial offices. But there are no averments in the

complaint showing that any *unseemly* wrangle is likely to occur. When the time arrives, if defendants shall demand the respective offices to which they claim to have been elected and such demand be refused, there is nothing in the complaint to indicate that they will do anything more than seek by proper legal proceedings to have their predecessors ousted, and themselves inducted into office. We are confident that none of the rival claimants, either old or new, will resort to other than legal and orderly methods to secure or hold the offices in question. Though occasion may sometimes require equitable relief or protection in addition to the proper legal proceedings in controversies over public offices, yet the complaint in this case states no facts from which any kind of violence, disturbance or intrigue is to be apprehended. There is no probability that the police, the sheriff's posse, or the military will be called into requisition. The idea that such means may be resorted to, in advance of legal proceedings to settle the title to, or possession of, public offices, has been pretty effectually dispelled by recent opinions of this court. *In re Fire and Excise Commissioners*, 19 Colo. 482; *The People ex rel. v. Martin and Orr*, 19 Colo. 565.

In Spelling on Extraordinary Relief, vol. 1, sec. 620, it is said : " Though there is some conflict of authority as to how far equitable relief by injunction may be successfully invoked to protect one in the possession and exercise of a public office, it is well settled by a great preponderance of authority that injunction is not a proper remedy to try the title between rival claimants, as to which is entitled to fill and exercise the duties of an office, *quo warranto* and not injunction being the proper remedy."

We are urged to entertain the present proceeding for the purpose of reaching an early decision of the controversy between the rival claimants to judicial positions, and thus prevent confusion in the administration of justice. This proceeding is commended as a " short cut " to a determination of the controversy. But *short cuts* in legal controversies are seldom satisfactory to the Anglo-American race. As a

rule they only submit when they have had full opportunity to fight out such controversies by proper proceedings and to carry them, if they desire, to the court of last resort.

For illustration, it would seem desirable to avoid a lawsuit to determine whether the present judge of the thirteenth judicial district shall continue to hold his office for three years more, or whether he shall give place to another recently chosen *as* his successor. But it may be that nothing short of a real lawsuit will suffice to determine such controversy. If such lawsuit shall come, it will not be the first contest over the very same office. The present incumbent holds his position by virtue of the decision of this court sustaining his election by a plurality of two votes. See *Allen v. Glynn*, 17 Colo. 338. The controversy in that case was not an *unseemly* wrangle. It arose out of an honest difference of opinion as to the meaning of certain provisions of the then new Australian ballot law; and the statute was so worded that this court was divided in opinion. When judges disagree, it is not surprising that lawyers and their clients differ. The fact is, judges as well as lawyers cannot always agree when called upon to construe written constitutions and laws, or other written instruments. Judges agree more generally than lawyers, because they have no personal interests or clients to influence their judgments. But lawsuits are often a necessity in a free government. In no doubtful case where large interests are involved will an *ex parte* opinion be accepted as decisive. This is well illustrated in respect to the very matters now sought to be brought before this court for reconsideration. See *In re Election of District Judges*, 11 Colo. 373, where these same matters were considered and an opinion given in response to a question from the governor. That opinion, however, was given before the calling of the election, so that no individual claims to office had arisen. It is manifest that such opinion is not now accepted as conclusive, because not delivered in an actually litigated case. We refer to this as fortifying the view that the present controversy must be heard and determined, if at all, in some

proceeding where the jurisdiction of the court is undoubted. When it is heard and determined in a proceeding where the court has jurisdiction, not only to express its *opinion*, but to render and enforce its *judgment*, the decision will have more weight.

The remedy provided for controversies of this kind is entirely adequate and reasonably speedy. Even if not as speedy as could be desired, this court is not justified in exercising an unwarranted jurisdiction to escape the delays resulting from the well settled principles of our jurisprudence. As was said by Mr. Justice Goddard (19 Colo., *supra*): "Reasonable delay is the price we pay in order to secure the protection and vindication of personal and property rights under a government like ours." Judicial discretion is often beneficial; but the vesting of too much discretion in any public official tends to the development of arbitrary power, destructive of those certain and fixed rules of law which are the boast of our people.

We have been favored with able and instructive briefs *pro* and *con* in connection with the argument of this case; but a certain appeal in writing made afterwards, to the effect that this court should disregard jurisdictional precedents and undertake by this proceeding to anticipate and decide future lawsuits, is as unreasonable as it must be unavailing. We should have our hands full if we were to yield to such appeals in cases that might thus be pressed upon our consideration. It would, moreover, be a sad blow to the rights and liberties of the people if the courts were thus to anticipate and decide controversies not regularly before them, and which may never actually be brought to trial. Despotic governments may do this, but free constitutional governments never.

If lawsuits result from the present controversy, the plaintiffs and defendants, respectively, must, as in all litigated cases under our system of jurisprudence, take and bear the responsibility of them and abide the result. We have examined many cases that have been cited, but do not deem it necessary to discuss them, as they do not militate essentially from the view we have taken.

Our conclusion is that the complaint discloses no ground for equity jurisdiction, and certainly no ground for the interposition of the extraordinary jurisdiction of this court by the issuance of a *quasi* prerogative writ of injunction. The application to take jurisdiction by the issuance of such writ will, therefore, be denied, and the complaint presented will be dismissed.

*Complaint · dismissed.*