PICKARD v. JONES et al.

TAYLOR v. PICKARD et al.

Court of Appeals of Kentucky.

Oct. 26, 1951.

Luker & Tooms, London, Flem D. Sampson and Kenneth H. Tuggle, all of Barbourville, for Pickard.

J. J. Tye, H. H. Owens, Barbourville, for Jones.

J. B. Campbell, Barbourville, Cleon K. Calvert, Pineville, for Taylor.

STANLEY, Commissioner.

This is a contest of the election of the Republican candidate for Circuit Court Clerk of Knox County. The original returns were: Tip Jones, 2,562; John H. Pickard, 2,514; and H. L. Taylor, 258 votes. The action was filed by Pickard against Jones. He counterclaimed and Taylor intervened. The Circuit Court adjudged Jones to be the nominee. The other parties appeal.

1. A controlling issue is whether Jones violated the Corrupt Practices Act by having spent more money than the statutory limit. His filed expense accounts showed $1,060, and there was contradictory evidence as to an additional $105. KRS 123.050 limits the amount for a county office to $1,000 except in counties "having" a city of any of the first three classes within their boundaries. In a "county having [a] city of the third class," the maximum is $1,500.00. Jones claims that Knox County has such a city since a part of Corbin is within its boundaries. The city lies in both Knox and Whitley County, but nearly four-fifths of the population is in Whitley County. There are 6,295 registered voters in Whitley and about 1,000 in two precincts located in Knox County. Thus, we have a situation that cannot be fitted into the letter of the statute. In its enactment, the Legislature apparently recognized that the greater the number of votes to be persuaded, the more expensive it is for a

48

candidate to conduct a campaign. Yet, the standard or stipulation of the progressive sums permitted is not based upon the number of voters or the population. It is upon the factor (in the present case) of a "county having [a] city of the third class." The statute does not say "containing" or "embracing" but says "having" such a city. KRS 123.050(2)(i). In classifying Corbin, the Legislature placed it in both Whitley and Knox County. KRS 81.010. So, Knox County does have a portion of such a city. Barbourville is a city of the fourth class. It further appears that in the past the local people have regarded the limitation on campaign expenses for county offices as $1,500. We are of opinion that the statute should not be so strictly construed in its application to what is the only exceptional condition in the state. We, therefore, hold that the contestee, Jones, did not violate the Corrupt Practices Act.

■ 2. Charges were also made that the contestant had expended more than $1,000, but there is no claim that he exceeded $1,500. In his countercontest, Jones contends that Pickard is chargeable with the violation of the Corrupt Practices Act and, therefore, may not be given the nomination. The charge is based upon the fact that a few friends prepared and had published certain campaign literature, signing it, "Pickard Campaign Committee." This was done with the full knowledge and definite approval of the candidate. The group filed no report or statement of expenditures. Pickard paid for the advertising. Irrespective of the proper construction of the statute as it might affect the rights of a candidate, or the imposition of the penalty depriving him of the nomination where it was violated, see Hays v. Combs, 177 Ky. 355, 197 S.W. 788, we are of opinion that a group, without definite organization, which voluntarily assists a candidate in the way described does not come within the description of a "campaign committee or individual having charge of the candidacy or any person or group of persons managing or paying the expenses" of a campaign which is required to file statement of political expenditures. KRS 123.080.

■ 3. The intervenor, H. L. Taylor, claimed the right to the nomination under the terms of KRS 122.010. It is not necessary that we undertake to reconcile this section with KRS 122.020, which denies the right to contest an election to a candidate who has not received as many as fifty per cent of the votes cast for the successful candidate. We find that neither of the other candidates violated the Corrupt Practices Act, hence, Taylor's claim passes out irrespective of the provision of the Statutes he relies on.

4. There were 84 ballots cast by absentee voters of which Jones received 70 and Pickard 14 votes. The procedure prescribed for handling absentee ballots was not followed. Pickard casts suspicion on the action of the Democrat election commissioner, the sheriff, as a member of the board, and the county court clerk, all of whom favored or supported his opponent. The only consideration we need give to the suspicion is that it emphasizes the need that election officials should perform their duties in this connection in such a clear and scrupulous way that it affords no ground for criticism. The meticulous system recognizes that absentee voting is a risky method. Unless the statutory provisions be strictly followed, there is greater opportunity for persons of evil design to corrupt the ballot.

■ There was irregularity in the beginning. The box in which the absentee ballots were to be placed inviolate on receipt by the clerk was prepared by the sheriff, the Democrat commissioner, and the county clerk, referred to above, in the absence of the Republican commissioner, who favored the contestant. No key to the box was delivered to the absent member. Three days before the election, when many of the absentee ballots had been returned, his key to the box was delivered to his wife. This clearly violated KRS 126.240. Standing alone, the irregularity is not of fatal consequence. The substance of the statute relating to the counting of absentee ballots, KRS 126.270, is that as soon as the polls have closed, the election commissioners shall open the box containing them and examine the envelopes one at a time as to

form and condition. Among the requirements is the provision that if the affidavit of the voter on the face of the inner envelope is in proper order, his name shall be read aloud. The voter is then subject to challenge and the election commissioner determines whether the inner envelope containing the ballot shall be accepted or rejected. This is in effect the same process observed where the voter is present in person. If the ballot be accepted, the statute further prescribes in detail the manner of removing the ballot from the envelope without exposure and of authenticating it. After all the ballots have been re-deposited in the box, it must be thoroughly shaken so as to redistribute the ballots therein. The box is then opened and the votes counted and tabulated and added on the regular returns of the respective precincts where the voters resided.

In the present case, the three election commissioners took the absentee ballot box and fastened themselves up with it in seclusion in a small room in the courthouse. Every person, including the county clerk, was excluded. One of the commissioners testified, "When we first entered the room there were some people come in there to act as challengers or representatives and we had to ask them to get out." It was subsequently developed that at least three votes were irregular because the voter had not signed the affidavits. The testimony of the commissioners is, in effect, that they followed the law in respect to counting the ballots. However, it shows that everything was not done according to the law. Two of the commissioners signed the back of the ballots though the statute calls for one commissioner and the county clerk. The commissioners made their tabulation, put the ballots back in the box, locked it and then rejoined the public.

■■ The prescribed procedure is not merely for counting absentee ballots and tabulating the returns. It is part of the process of casting and receiving the ballots. That is the only time and place in which it is done. In the present case there was no opportunity for challenge or inspection, a right given by the law. That would go not only to qualification of the voter but checking to see that he had not died or had not already voted in person at the precinct polls, to prevent which KRS 126.180 and 126.280 are designed. Doing things like this in secret affords too great an opportunity for the perpetration of fraud for the courts to ignore them. It subverts the principle of long standing that opportunity shall be afforded for challenging a voter and inspecting every ballot, and the more recent statutory provision for public canvassing and tabulating of all of them. KRS 118.240, 119.210, 126.270. There would be little difference from a case where precinct election officers isolated themselves with 84 unidentified persons and then returned to the polls a box containing 84 ballots.

■ We have been reminded by the appellee of the caution with which the courts move to defeat the apparent will of the people or to disfranchise voters because of the irregularity or dereliction of election officials. The subject has been often discussed and the rule is well established, although its application frequently presents a troublesome question. Always there is in the consideration a balancing of the right of the voters, the right of the candidate and the right of the public. The failure of election officers to obey mandatory provisions of a statute relating to the conduct of the election and designed to secure both the secrecy and the integrity of the ballot may so taint the election as to require rejection of at least the part affected.

■ We have held certain provisions of the absentee voter's statute to be directory and a departure from the procedure, therein prescribed, in the absence of fraud or gross irregularity, not to be of such substantiality as to affect the fairness of the election. Stabile v. Osborne, 309 Ky. 427, 217 S.W.2d 980; Steel v. Meek, 312 Ky. 87, 226 S.W.2d 542, 543. In the present case the most serious facts are that the candidates were deprived of the opportunity to challenge the qualification of the voters and to see that the envelopes containing the ballots were in due form and to have

the ballots counted in the open. The cumulative effect of the departures by the officers from the clear mandates of the statute is such that we must hold they disfranchised the legal voters or those who cast valid absentee ballots. The returns must be discarded in determining the results of the election. This makes Jones' vote 2,492 and Pickard's 2,500.

We turn to the record to see the net results of considering individual voters claimed to have been disqualified and ballots shown to be invalid. Consideration is first given the votes for Pickard challenged by Jones on this appeal.

5. In his countercontest Jones classified in separate literary paragraphs under Paragraph II of his pleading, according to the grounds, the votes for Pickard which he charged to be invalid. In all the paragraphs listing the names and the reasons why they were irregular or disqualified voters, the pleader stated that they had voted for his opponent, Pickard, except in one group of 46 who were charged to have voted openly without right. Inadvertently, no doubt, the statement they had voted for Pickard was omitted from this paragraph. The appellant's demurrer to the pleading as a whole and to each paragraph thereof was overruled. Proof was taken as to the illegal voters in this category, and 33 were proved to have voted openly for Pickard. The appellant's exceptions to the evidence on the ground that there was no pleading to support it were overruled. He relies upon the familiar, general rule that a pleading will be construed most strongly against the pleader and no inference or presumption will be indulged in his favor. The allegations of this part of the pleading meet the requirements of election contest pleading except the omission of the charge they had voted for the pleader's opponent. This literary paragraph follows third in order the beginning or the predicate of Section II of the pleading, namely, "as further grounds of countercontest" etc. Just before the prayer, the pleader stated, "Each paragraph is made part of all other paragraphs." It is followed by two other illegal classes, charged to have voted for Pickard.

The several paragraphs of an election contest pleading need not be so complete in themselves as to set up distinct causes of action. The pleading of the different grounds will be considered with the whole as being but one cause of action. Goad v. Jackson, 270 Ky. 92, 109 S.W.2d 17; Wooton v. Smith, 288 Ky. 48, 155 S.W.2d 466; Combs v. Brock, 240 Ky. 269, 42 S.W.2d 323. Any pleading, especially in an election contest, which usually requires haste in preparation, should be given a rational construction according to its general scope and tenor. Certainty to a common intent is all that is generally required, technical objections being disregarded. Siler v. Brown, 215 Ky. 199, 284 S.W. 997. Where the pleading is open to construction, a meaning which will reasonably support it should be adopted rather than one which will defeat it. The challenged allegation, whose deficiency is undoubtedly due to inadvertence, should be considered with the context. It would be an unjust interpretation to say that it amounted to naught and prohibited the consideration of the evidence and purging of the many illegal votes. We hold it sufficient. But, it may be added, that if we should regard it strictly and technically, the legal Paragraph II was good in part, so the demurrer was properly overruled on that account. Young v. Wehmeyer, 192 Ky. 589, 234 S.W. 201.

We conclude that these 33 votes should be deducted from Pickard's total, his counsel conceding the same if the pleading be held sufficient. This puts Jones ahead by 25 votes.

Pickard concedes 10 non-resident voters are chargeable to him and Jones concedes that 21 illegal votes are chargeable to him, which concessions bring Jones' majority to 14. In dispute are 38 votes cast for Pickard and 13 cast for Jones. We consider some of these. Four persons who voted for Jones testified that they had lived in their respective precincts and had been voting there for a long time as registered voters, but the record shows they were not registered, and that evidence must control. These 4 may be deducted from Jones, leaving him a majority of 10. Testimony

 

of five persons that they were registered was either sustained 'by the record or not contradicted 'by it. These should not 'be rejected. So, Jones' majority of 10 votes remains undiminished. It becomes unnecessary to consider the evidence relating to the 38 votes which Jones insists should be deducted from Pickard. It would appear that the claim is well taken as to some of them and not well taken as to others, but the deduction of any number would only increase Jones' majority that much.

The judgment is affirmed on 'both appeals.

LATIMER, Judge (dissents).

He is of opinion that failing to allege the table votes were cast for Pickard was fatal, and the evidence was incompetent. This would give Pickard the nomination.

COMBS, J., not sitting.