**Elmer THURMAN, Appellant,**

v.

**M. C. "Doc" KEEN, Sr., Appellee.**

Court of Appeals of Kentucky.

Sept. 19, 1969.

Robert L. Wilson and Wilson & Wilson, Jamestown, for appellant.

James C. Jernigan, Tompkinsville, for appellee.

REED, Judge.

This is an election contest that presents a single question: Did the admitted noncompliance with election laws by election officials in the preparation and operation of a voting machine taint the election process at the precinct where the machine was used to the extent that the votes cast at the precinct must be rejected in determining the results of the election?

At the May 27, 1969 primary election in Cumberland County, the contestant, Thurman, and the contestee, Keen, were the only candidates seeking the Republican nomination for the office of sheriff. The election commissioners certified that Thurman received 1,054 votes and that Keen received 1,091 votes. Thurman obtained a recanvass of several precincts, including the one involved in the appeal. The recanvass confirmed the official election returns. Then Thurman filed a contest action against Keen in the circuit court. The trial judge dismissed Thurman's contest action; this had the effect of declaring Keen to be the Republican nominee for the office of sheriff in the ensuing general election. Thurman appeals.

In his brief, Thurman states: "Contestant takes this opportunity to inform the court that he is solely and completely rely-

ing upon the violations of election laws concerning the setting of the public counter in Precinct No. 3."

Voting machines were used in all precincts. KRS 125.040 requires each voting machine to be equipped with a device that will show at all times during an election how many persons have voted; this device is referred to in the statute as a public counter. KRS 125.070 requires the county clerk to set the public counter on zero as a part of voting machine preparation procedure prior to an election. KRS 125.080 requires the county clerk to notify the election commissioners not later than three days before the election that the machines are prepared and ready for use; the election commissioners are required by the same statute to meet and to examine the machines and to determine whether the statutory preparation procedures have been performed. KRS 125.120 provides that the precinct election officers must determine that all counters registering votes for candidates and the public counter are set at zero before they open the machine to voters; this statute also provides that in the event the counters are not at zero the precinct officers shall contact the election commissioners who are to see to it that the specified counters are set at zero. In the event this cannot be accomplished within one hour of the time of the opening of the polls, then the county clerk is directed to provide a reserve machine properly prepared for voting.

When the precinct officers in Precinct No. 3 initially inspected the voting machine, they discovered that the public counter did not register zero but the number 497. This indicated that 497 persons had voted on that particular machine, perhaps at a previous election. The precinct officers did determine, however, that all of the individual counters for all persons who sought nomination for the various county offices were set at zero. Several persons were waiting to vote, but before any person voted in Precinct No. 3, the precinct officers made a certification on the election returns of that precinct that all counters were set at zero except the public counter which was set at 497. They also certified that the number registered on a device called the protective counter was 03993. After the polls were closed, the election officers made a certification that the number of votes shown on the public counter of the machine at the time of the closing of the polls was 836, and that the number registered on the protective counter was 04332. In this particular precinct, the contestee, Keen, received 159 votes, and the contestant, Thurman, received 100 votes. Keen's plurality in all the precincts was 37 votes, and his plurality in the precinct in question was 59 votes; hence, if the votes cast for both contestant and contestee in Precinct No. 3 were eliminated and rejected, Thurman would then have a plurality of 22 votes in the primary election and would be entitled to be adjudged the Republican nominee for the office.

The evidence is undisputed that the county clerk did not properly prepare the voting machine in Precinct No. 3. It is further clear that neither the election commissioners nor the precinct officers observed the duties imposed upon them by our election statutes. The election commissioners did not inspect the public counter on this machine, and the precinct officers allowed the election to proceed without notifying the election commissioners of the appearance of the public counter, and they also failed to request the clerk to provide a reserve machine. Nevertheless, the election officers clearly indicated on their official return that the public counter registered 497 at the start of voting and further certified the correct closing number registered by the same device at the time of the closing of the polls. Another relevant circumstance is that the machine was also equipped with a device called a protective counter in the evidence and referred to in the election statutes as an accumulative counter. The protective counter has as its function the registration of the total vote cast on the machine at a particular election

as does the public counter. It apparently is designed to act as a cross-check on the accuracy of the public counter. In this case, when the polls opened, the protective counter was set at 03993. When the polls closed the protective counter registered 04332. This indicated that 339 persons had voted in Precinct No. 3. The opening reading on the public counter was 497 and the closing reading on the public counter was 836, also indicating that 339 persons had voted in the precinct in question.

An examination of the total votes cast in the various races for Republican and Democratic nominations on the ballot establishes that there is a rational connection between the consistent readings of the two counters showing the total vote cast and the total vote recorded for each of the various candidates on this particular voting machine. The protective or accumulative counter is recognized but not required by statute, but in this instance its function was, in effect, to preserve the function of the public counter which is required by statute.

The trial judge found no evidence that the noncompliance with statutory duties by the election officials affected the outcome of the election; he noted the absence of any showing that the contestee, Keen, participated or was in any way responsible for the violations of the statutory requirements. The trial court held that although the election officials violated mandatory statutory duties and were possibly liable for the criminal penalties prescribed in the statute, the dereliction of the election officials should not be charged to the innocent voters so as to disfranchise them, and the plea to eliminate the votes cast in Precinct No. 3 was rejected.

■ There are numerous cases in this jurisdiction of election contests involving noncompliance by election officials with statutory requirements. It would be pointless to recount them because they differ in results by reason of factual distinctions principally concerning the extent of the violations and the effect of the conduct upon the election process. Where the election statutes do not expressly provide that particular violations will void the result of an election, or require the rejection of the part of an election affected, a judicial determination must be made in cases involving a failure to comply with statutory requirements by election officials concerning whether the failure so affected the election process that the voters affected must be disfranchised. Relevant to that determination are such circumstances as the seriousness of the violations; whether the irregularities are isolated or so numerous as to substantially affect the result; whether the violations are tainted with fraud or conspiracy; and whether the effect of the violation is such as to render the results of the election uncertain. See 29 C.J.S. Elections § 214, pp. 598–609. This judicial determination involves "a balancing of the right of the voters, the right of the candidate and the right of the public." Pickard v. Jones, Ky., 243 S.W.2d 46, 49.

In such cases as Arnett v. Hensley, Ky., 425 S.W.2d 546 and Hale v. Goble, Ky., 356 S.W.2d 33, the conclusion was that the irregularities in the conduct of the election so affected the casting, receiving, and tabulating of votes that the election process had been tainted to the degree which required a rejection of votes cast.

Burchell v. Smith, Ky., 262 S.W.2d 365 and Stanley v. Goff, Ky., 324 S.W.2d 124 are representative of situations where the determination was that the irregularities arising from violations of statutory requirements by election officers were insufficient to warrant rejection of the votes cast in the place where the violations occurred.

In our view, it is not significant in this election contest action that the election officers are subject to criminal penalties for derelictions; fair elections cannot be attained by reliance on the deterrent effect of criminal prosecutions of election officials. These prosecutions are infrequent and convictions are rare. The only apparent effective deterrent is to reject and eliminate the votes cast. While this pro-

cedure has the effect of disfranchising voters, it appears necessary to suffer this result to achieve a fair election process.

■ In the instant case, although different categories of election officials all were derelict, their noncompliance resulted only in a single circumstance—the erroneous beginning number on the public counter of the voting machine. The protective counter functioned as designed and confirmed the accurate operation of the public counter during the course of voting; there is no evidence that the error affected the result of the election; the evidence supports the trial judge's finding that a fair election was conducted at the precinct questioned in that all qualified voters were given the opportunity to cast their votes in secret, and their votes were properly tabulated and counted. It is our conclusion that under the facts of this case the proper determination is that the noncompliance with statutory requirements by the election officials did not taint the election process in the precinct to the extent necessary for a judicial conclusion to reject the votes cast. It should be explicitly understood, however, by candidates and by election officials that under different facts and a proper showing we will not shrink from our duty to foster fair elections by rejecting the votes affected by violations of statutory requirements by election officials even though that judgment entails a disfranchisement of a number of legal voters. The effect on the election itself of a judicial rejection of votes is not presented under the facts of this case and we express no opinion on the applicability of Watts v. Fugate, Ky., 442 S.W.2d 569.

The judgment is affirmed.

All concur.