Robert C. RIVES et al., Appellants,

v.

H. Foster PETTIT, Appellee.

James G. AMATO, Appellant,

v.

H. Foster PETTIT et al., Appellees.

Court of Appeals of Kentucky.

Jan. 15, 1974.

E. Lawson King, Fayette County Atty., Joseph B. Murphy, Frank G. Dickey, Jr., Asst. County Attys., Lexington, for appellants, Robert C. Rives and others.

Earl S. Wilson, J. Montjoy Trimble, Harry B. Miller, Robert M. Odear, Lexington, for appellant, James G. Amato.

F. Selby Hurst, Foster Ockerman, Rufus Lisle, Arthur L. Brooks, William R. Bagby, Lexington, for appellee.

PALMORE, Justice.

At the general election held on November 6, 1973, James G. Amato and H. Foster Pettit were the candidates for mayor of the new Lexington-Fayette County Urban

Government.[1] Except for absentee ballots, all voting was done by use of voting machines pursuant to KRS Ch. 125. According to the official count the total vote in the mayor's race was 20,397 for Amato and 20,285 for Pettit, a difference of 112. The count in Aylesford precinct, which is of central importance to this case, was 156 for Amato and 73 for Pettit, a difference of 83. The absentee ballot count was 255 for Pettit and 190 for Amato, a difference of 65.

Within 96 hours after the close of the polls Pettit requested a recanvass of the machines in all precincts.[2] Cf. KRS 125.-190. When the Aylesford machine was opened during the recanvass the names of Amato and Pettit as they appeared on the face of the ballot in the front of the machine were found to be in reverse order from that which had been determined in the pre-election drawing for position and shown on the official sample ballot, and in reverse order from their respective positions as they had been arranged on the print-out sheet, in the rear of the machine, upon which the totals of their votes were recorded.[3] In other words, and it is beyond dispute, if this was the condition of the machine while it was being used during the election all the votes cast for each of

these two candidates[4] according to the face of the ballot were registered for the other and so recorded on the print-out sheet at the end of the day.

Evidently upon the assumption that their authority or duties in a recanvass did not extend beyond verifying the figures shown by the mechanical counters in the rear of the machines, or because of uncertainty in this respect, the election commissioners declined to change the count for Aylesford precinct and upon completion of the recanvass proceeded to certify the result of the election in accordance with the original count.[5]

On November 14, 1973, Pettit brought two actions in the Fayette Circuit Court, Nos. 73–2561 and 73–2562, to which we shall refer as 2561 and 2562. Except for the portions relating to the relief sought the complaints were identical.[6] In 2561 he simply demanded a recount under KRS 122.100. In 2562 he demanded that the election commissioners be required to correct their certification and to issue a certificate of election to him. In the body of each complaint he alleged that there had been a mistake in setting up the Aylesford machine, resulting in an erroneous reversal of the votes recorded for him and Amato

---

1. See Holsclaw v. Stephens, Ky., 507 S.W.2d 462 (December 28, 1973).

2. There were 135 precincts, and 135 voting machines were used.

3. The face of the voting machine used in Fayette County has horizontal rows identified by letter, intersected by vertical columns identified by number. Paper ballot strips bearing the row and column number for each space on the ballot fit into the horizontal rows. The names of the candidates are printed or placed on these strips, which are then secured into the face of the machine. In this instance column 18 had been selected for the mayoral race. Pettit having drawn first place, his official position was in row E(18E) and Amato's in row F(18F). To the right of Pettit's name on the strip for row E, in spaces 19E, 20E, 21E and 22E appeared the names of four councilmanic candidates, and to the right of Amato's name, in spaces 19F et seq., appeared the names of four other councilmanic candidates. The situation dis-

covered in the recanvass was that on the machine used in Aylesford precinct the ballot strip for row F, including Amato's name, occupied row E of the machine and the strip for row E, including Pettit's name, occupied row F of the machine.

4. The same is true with respect to the councilmanic candidates whose names appeared on the two ballot strips in question, but their elections are not in litigation.

5. A reversal of the Aylesford count would have added for Pettit and subtracted from Amato 83 votes, overcoming Amato's apparent over-all majority of 112 by 54 votes.

6. The defendants named in both complaints were Amato, the members of the Board of Election Commissioners of Fayette County, and the County Court Clerk. All defendants other than Amato were eventually let out of 2562 upon the theory that it was strictly an election contest case as distinct from a recount proceeding.

in that precinct, correction of which would result in Pettit's election by a majority of 54 votes, and that after discovering the error during the recanvass the election commissioners had refused to correct it.

KRS 122.100, the recount statute, requires the circuit court, immediately upon notification by the clerk, to order all the "ballots, boxes and all papers pertaining to the election" transferred to the circuit court "and fix a day for the recount proceedings to begin." On the day thus fixed the court "shall proceed to recount the ballots if their integrity is satisfactorily shown and shall complete the recount as soon as practicable . . . . and direct the election commissioners whose duty it is to issue the certificates to issue the same to the party entitled thereto as shown by the recount." It is further provided by subsection (3) of this statute that if a recount proceeding is prosecuted in a contest proceeding it shall not await completion of the contest.[7]

In compliance with the statute the trial court in this case at once caused all of the election equipment (including the voting machines) and materials to be transferred to and secured in the custody of the circuit court and fixed a time for beginning the recount. On December 5, 1973, a judgment was entered in 2561 declaring Pettit the winner of the election by a vote of 20,368 to 20,314[8] and directing the issuance of a certificate of election to him. Amato and the other defendants appeal from that judgment.[9]

On the same day the judgment was entered in 2561, and in the same action, Amato filed an answer and counterpetition in which, among other things, he pleaded waiver and estoppel against Pettit and, in the alternative, asserted a contest in which he demanded that all of the absentee ballots and all of the Aylesford votes be eliminated on grounds of certain irregularities hereinafter mentioned.[10] At the same time Amato filed a similar pleading in 2562, in which he also asserted the pendency of 2561 as a bar to 2562.

On December 6, 1973, Pettit filed an amended complaint in 2562 "in order to preserve his grounds of contest in the event such judgment in the recount proceedings should be appealed and be reversed on appeal," etc. A sharp issue having arisen during the recount hearings with respect to the applicability and effect of KRS 61.060, which provides that no fact officially certified as required by law may be questioned except in a direct proceeding against the certifying officer or his sureties or upon an allegation of fraud or mistake on his part, Pettit's amended complaint in 2562 alleged in particular that any certificates the election commissioners or the county clerk had issued to the effect that the Aylesford voting machine was properly set up were erroneous and the result of mistake on the part of the officers so certifying. Other pleadings, counterpleadings, motions and amendments followed in due course but need not be enumerated here.

On December 11, 1973, the trial court entered an order recognizing that Amato had asserted a timely election contest in Pettit's recount proceeding (2561) and consolidating that phase of 2561 (Amato's

---

7. KRS 122.070 and 122.080 allow time for pleadings and proof in contest actions, whereas KRS 122.100 calls for summary proceedings following proper commencement of a recount suit.

8. The judgment adopted as findings of fact and conclusions of law in 2561 a 29-page opinion containing a meticulous exposition and analysis of both the evidence and law and concluding that the count in Aylesford precinct should be reversed.

9. The appellants other than Amato appeal *pro forma*, expressing neutrality on the merits.

10. Whether this pleading was filed before or after the judgment is immaterial to the recount phase of the case, since the waiver and estoppel questions had been specifically raised during the course of the recount hearings and KRS 122.100 does not require defensive pleadings.

contest) with 2562 (Pettit's contest and Amato's countercontest) for purposes of trial. The consolidated contest proceedings culminated on December 28, 1973, in a judgment for Pettit, from which Amato appeals. The two appeals[11] have been consolidated for consideration and disposition by this court.

What has been recited thus far is intended to delineate the course of the pleadings. It is necessary to understand also how the evidence was developed and treated.

At the beginning of the hearings the trial court determined that 2561 was properly a recount proceeding under KRS 122.-100, that 2562 was a contest suit under KRS 122.070, that the evidence to be heard in the recount inquiry would be confined to the integrity of the voting machines[12] from the time they were first opened on election day (plus, of course, if the integrity should be established, a recount of the votes), that in order to obviate unnecessary duplication the testimony received with respect to the recount would be treated as evidence in the contest action as well, but subject to the right of the parties to produce other and further evidence in the latter, and that the two actions would thereafter be consolidated for that purpose.[13]

After all the witnesses for both sides had testified and the parties had announced closed, the trial judge, over objection by the defendants (because plaintiff's motion for an inspection of the machines came after his counsel had announced closed), proceeded in the presence of counsel for the respective parties to inspect the voting machines at their place of storage and to dictate his observations for transcription as a part of the evidence to be considered in arriving at his judgment. In the course of examining the Aylesford machine he observed, among other things, that the ballot strips in the face of the ma-

chine occupied the horizontal rows in the following order, beginning at the bottom: G, E, F, D, C, B and A (that is to say, the E and F strips were in reverse order from what they should have been). He found also that when he activated the voting levers on the fifth and then the sixth horizontal rows (from the top) in column 18 of the machine the votes were registered for 18E and 18F, in that order, as permanently lettered in the back of the machine.

Previous to the conclusion of other testimony the trial court had also examined and counted the absentee ballots. He found that some had been illegally cast, but they could not be identified and were not sufficient in number to affect the result of the election.

After the judgment of December 5, 1973, had been entered in the recount proceeding, counsel for Amato took the position, as set forth in a written statement reiterating their previous objections and motions, that the publicity given by the local news media to the opinion issued by the trial court with the judgment had effectually "destroyed . . . the possibility of successful investigation of a precinct in which Plaintiff had already procured affidavits of 125 voters but only used 30 of them as witnesses," etc., and closed their case without taking further evidence. The trial court thereupon entered a 21-page opinion addressed to the contest aspects of the case, and in the judgment of December 28, 1973, adopted the opinion as its findings of fact and conclusions of law.

We shall not attempt to recapitulate the evidence. It is clearly sufficient under CR 52.01 to sustain the trial court's findings of fact, which were substantially as follows:

A. *In the recount case* (2561).

None of the voting machines had been altered or changed in any way since being

---

11. From the judgment of December 5, 1973, on the recount and the judgment of December 28, 1973, on the contest.

12. Actually the evidence covered, as it should have, the absentee ballots.

13. As stated above, the consolidation eventually was ordered on December 11, 1973.

used in the election and were in the same condition at the time of the recount. On the Aylesford machine the ballot strips for rows E and F were reversed, so that the votes cast for each of the two mayoral candidates as their names appeared on the face of the machine had been recorded for the other. Compensating for this error, the correct vote in this precinct as tallied in the recount was 156 for Pettit and 73 for Amato. There had been no tampering with the absentee ballot box or its contents, and the recount coincided in all respects with the original count following the election. The net result of the recount was 20,368 for Pettit and 20,314 for Amato, giving Pettit a majority of 54 votes.

### B. *In Pettit's contest action* (2562).

The same findings were made with respect to the misplacement of the ballot strips as had been made in the recount action (2561), in addition to which the following facts also were determined: In their pre-election examination of the voting machines as required by KRS 125.080 the election commissioners had not opened the fronts of the machines, and their certificate to the effect that the machines had been properly prepared and tested and were ready for use in the election was in error and resulted from a mistake on their part. Neither had any of the four election officers at Aylesford precinct made "any real effort to comply with the directions of KRS 125.120 that the machine be examined to ascertain whether the ballot labels were arranged as specified on the sample ballot shown on the instruction card provided by the clerk." The misplacement of the ballot strips occurred in the preparation of the machines by deputies of the county court clerk prior to the election. After they had been thus prepared, all testing and checking by the clerk and his deputies was limited to the mechanics of the machines. They did not compare the face of each machine against the sample ballot, and the error remained undiscovered by reason of the subsequent and similar failure of the election commissioners and the precinct officers to make such a comparison.

### C. *In Amato's contest actions* (2561 and 2562).

Amato's contest challenged in their entirety the absentee ballots and the vote in Aylesford precinct.

There is no dispute as to the way in which the absentee ballots were handled and counted. Instead of removing the outer envelopes and placing the inner envelopes in a locked ballot box upon arrival, as required by KRS 125.240(2), the county clerk put the ballots in the box without opening or removing the outer envelopes, and the count was begun on the day after the election instead of 3:00 P.M. on election day as permitted by KRS 125.250(2). The box was brought into the circuit courtroom, where it was unlocked and opened in the presence of numerous witnesses. The outer envelopes were removed and thrown back into the box and the inner envelopes (which bore no identifications) were stacked in a pile, following which the inner envelopes were opened and the ballots were counted.[14] There was no evidence of actual fraud or chicanery of any kind in the handling and counting of these ballots. In substance, the trial court found that the irregularities in failing to handle the absentee ballots in conformity with the statutory requirements in question affected neither the secrecy or integrity of the ballots nor the fairness and certainty of the election, from which finding it was concluded that the absentee ballots had been handled in "substantial compliance" with the statutes.

The grounds on which the entire Aylesford precinct vote was attacked are that (1) the election officers for the precinct

---

14. KRS 125.250(2) further requires, "Upon removal of each ballot from its inner envelope, it shall be left folded and returned to the box. When all inner envelopes have been emptied, the ballot box shall be thoroughly shaken and then reopened." This procedure was not followed.

were not sworn as required by Const. § 228 and KRS 62.010, (2) one of the Republican officers (Mrs. Ramsey) was a registered Democrat and did not reside in the precinct,[15] (2) prior to the opening of the polls at 6:00 A.M. and for about one hour thereafter the other three election officers would not permit Mrs. Ramsey to participate or perform her duties as an officer, (4) the voting machine was not boxed, securely covered and removed from the polling place "as soon as possible after the completion of the count," as required by KRS 125.150(5), and (5) if it so happened, the incorrect arrangement of the ballot strips on the machine rendered the vote uncertain.

In brief, the factual determinations pertinent to these grounds were as follows: (1) There was no finding of fact with respect to whether the oath of office was taken, the trial court having concluded as a matter of law that in the absence of fraud, misconduct or bad faith the alleged irregularity was immaterial. (2) Mrs. Ramsey, a Democrat, resided in another precinct. She had volunteered to work in the election and was called as a last-minute replacement to fill a vacancy at Aylesford precinct. Though not legally qualified, she acted in good faith. (3) Upon Mrs. Ramsey's arrival at the Aylesford voting place her qualifications were questioned by one of the other officers, and because of this objection she took no part in, conducting the election until about 7:00 A.M., when her qualifications were verified by the Board of Election Commissioners. (4) The voting machines at the 135 polling places were removed by two crews of workmen who began their work on Tuesday night, November 6, following the election and continued it until completion on Thursday, November 8. The trial court

concluded as a matter of law on the undisputed facts that there had been no violation of the statute. (5) The ballot strips for rows E and F on the face of the machine were erroneously arranged in reverse order, unintentionally and as the result of neglect. The error did not render the result uncertain. There was no justification for assuming that anyone attempted to vote by row or number rather than by name.[16]

We come now to the arguments advanced in support of the appeals, at which point it is appropriate to recognize and to express our appreciation of the monumental efforts contributed by the trial judge and by counsel for both sides in completing the records and briefs under pressure of extreme exigency. If we appear in some instances to give short answers to serious arguments, it is not because we do not regard them as without substance or have not considered them carefully, but because the public interest in a prompt resolution of the controversy discourages the luxury of philosophical discourse.

■ 1. Despite its anachronistic terminology, fashioned originally for paper ballots, we hold that the recount statute, KRS 122.100, does apply to machine voting.

■ 2. The allegation in 2561 that a mistake had been made in setting up the Aylesford machine, resulting in an erroneous reversal of the votes in that precinct, was surplusage and did not have the effect of casting the action under the contest statute, KRS 122.070, instead of the recount statute. Cf. Kincaid v. Hurst, 287 Ky. 824, 155 S.W.2d 225 (1941). Moreover, the error in arrangement of the ballot strips on the Aylesford machine was not an irregularity in the *conduct of the election* within the meaning of Hogg v.

15. KRS 127.040(1) provides for four election officers, to be divided equally between the two major parties. KRS 127.040(2) requires that they be qualified voters of the respective precincts in which they serve.

16. Both the name of the candidate and the number of his space on the ballot were printed in that particular space on the ballot strip. In Pettit's space, for example, were printed the space designation "18E" and immediately thereunder the name "H. Foster Pettit." In order for the mechanical counter to be activated it was necessary for the voter to pull the lever down across the name of the candidate.

**482**

Howard, Ky., 242 S.W.2d 626, 628 (1951), but was a mechanical error affecting the *counting process.* As such, it was properly correctible in a recount proceeding. If it occurred, and of course we are bound to accept the trial court's finding that it did, there can be no doubt that the votes actually cast for each of the two candidates on the face of the ballot in that precinct were registered for the other. In effect, through no fault of its own the machine miscounted the votes, and the trial court counted them correctly—that is, as they were cast by the voters. The election commissioners could and should have done the same thing in the recanvass. There is, indeed, no principle of law or other good reason why such an error could not be corrected in either a recount or a contest proceeding. Each of Pettit's complaints (in 2561 and 2562) stated a good cause of action, though 2562 could have been abated (in effect, it was) pending a conclusion of 2561.

3. KRS 125.080 provides that when the county court clerk has prepared the voting machines for use in an election and has so notified the election commissioners, the election commissioners shall inspect the machines after giving written notice of the time and place of the inspection to all candidates and political parties at least 24 hours in advance. Subsection (3) of the statute provides that any candidate "may be present when the examination of the machines is made by the county board of election commissioners." The inspection in this instance was conducted in stages, as the preparation of the machines was completed, on the three Tuesdays preceding the election. Both Pettit and Amato were duly notified, but neither of them (nor, for that matter, any other candidate) attended any of the inspections. It is forcefully argued that by his failure to avail himself of the opportunity to examine the machines and see that they were properly arranged before the election Pettit waived the right and is estopped to raise the question afterward. Allen v. Glynn, 17 Colo. 338, 29 P. 670 (1892), Bowers v. Smith, 111 Mo. 45, 20

S.W. 101 (1892), Halldow v. Wykle, 68 Misc.2d 155, 326 N.Y.S.2d 250 (1971), and our recent opinion in Fletcher v. Teater, Ky., 503 S.W.2d 732 (1974), are among the authorities cited in support.

Each of the cited cases bears analogy to this case in some one or more aspects, but none is "on all fours." *Bowers* and *Fletcher* concern postelection attacks on the right of a candidate to have his name appear on the ballot. *Halldow* is the opinion of a trial court denying a preliminary injunction in an action to have an election declared void by reason of a mechanical error in the arrangement of a voting machine which prevented voters from voting for more than one candidate per column whereas they were supposed to be able to vote for two. *Allen* involved straight-ticket votes by paper ballot, on some of which the successful candidate's name had erroneously been placed under the wrong party emblem, and it does fairly stand for the principle that if a candidate having the right to inspect and have the ballots corrected before the election fails to do so he may not base a postelection contest upon an error he could and should have discovered and caused to be corrected.

We simply do not find the principle to be sound. If it had been the intention of the General Assembly, in providing candidates a right of inspection, to foreclose any future inquiry and stamp a seal of indelibility on all undetected errors in the absence of the inspection, it would have been a simple matter to say so. Nor can we reasonably imply such an intention in the face of the public interest, as distinct from that of the candidate himself, in the integrity of the election process.

■ The examination of a voting machine, by its nature, is more complex than the inspection of a paper ballot. The machine must be tested in addition to being visually observed. The error in this case could have been seen, of course, but what if it had been some defect in the machine itself? From the standpoint of sheer

practicality it would be grossly unrealistic to expect or require every candidate for public office to examine and test each and every voting machine that is to be used in his election. We are quite firmly of the opinion that while the candidate has the right to attend and witness the inspection, he has also the right to rely upon the assumption that the officers who prepared the machines and the officers who were required to inspect them have carried out their duties.

Fletcher v. Teater, Ky., 503 S.W.2d 732 (1974), has no legitimate role in this case. The law pertaining to the manner in which a candidate's right to have his name appear on a ballot must or can be tested is laced with currents and factors not relevant here. The whole thrust of the policy implemented by that case is to avoid misleading the public. It has no relationship to waiver by or estoppel of the individual contestant. As a matter of fact, to deny this inquiry would subvert the principle of Fletcher v. Teater by permitting the votes of people who believed they were voting for one candidate to be counted for the other.

█ 4. It is contended that by receiving the evidence in the recount phase of the case as evidence in the contest phase as well the trial court in effect telescoped the contest into the more limited procedures of a recount, forcing the contest to immediate trial before the pleadings were completed and circumventing Amato's right to the time allowed by KRS 122.080, the contest statute, for taking and completing the evidence, thus violating his statutory and constitutional rights.

We do not so construe the action of the trial court. The contention now being considered stems from the position taken by counsel for Amato throughout the proceedings, and still being maintained, that there could not be a recount in such a case as this and that the two lawsuits filed by Pettit can neither separately nor collectively amount to anything but an attempted election contest under KRS 122.070 and 122.-080. But as heretofore made clear in this opinion, we consider that to be an erroneous premise.

It is beyond cavil that a recount proceeding is not to await the trial of a concurrent contest proceeding. Cf. KRS 122.-100(3). The trial judge conducted these proceedings in the strictest conformity with that principle. That the factual question of how the Aylesford machine was arranged while it was being used on election day was relevant in both the recount and contest proceedings could not operate to take it out of the recount case merely because it was not yet time to try the contest case, and if a resolution of the question in the recount case became *res judicata* in the contest it did not thereby deprive Amato of any rights. A determination adverse to Pettit would have had the same effect upon him in the contest case, and it certainly is no answer to say that Pettit had the advantage because, having had the first knowledge the suits would be initiated, he had the first and best opportunity to scour the precinct for witnesses.

At the very beginning of the hearings the trial judge made it explicit that he would later consider the recount evidence in the contest proceeding in order to avoid duplication, and that both sides could add such further evidence as they desired. As we have observed, however, counsel for Amato eventually elected not to produce more evidence. We do not imply any criticism of that choice, because insofar as Aylesford precinct was concerned it is probable that the recount judgment had virtually ended the encounter. Again, however, the statutes had given the recount the right-of-way over the contest.

█ 5. The point is made that the judgment of December 5, 1973, directed the county board of election commissioners to issue Pettit a certificate of election, whereas his complaint in 2561 did not demand such relief and the board has no statutory authority to issue a certificate of election.

We have difficulty in comprehending this argument. Pettit demanded a recount, which is all that was required. KRS 122.-100(1) expressly requires the court to "direct the election commissioners whose duty it is to issue the certificates to issue the same to the party entitled thereto as shown by the recount." KRS 118.400(1) designates the county board of election commissioners as the official agency that is required to issue election certificates in county-wide elections. It appears to us that the judgment orders only that which the statute directs it to order.

■ 6. We do not agree that Pettit failed to prove the effect of the error in Aylesford precinct and that if the vote in that precinct is to be disturbed at all it must be eliminated *in toto*, cf. Lakes v. Estridge, 294 Ky. 655, 172 S.W.2d 454 (1943), and Upton v. Knuckles, Ky., 470 S.W.2d 822 (1971). Both the name and position number of each candidate appeared in print under the lever that had to be pulled down in order to vote for that candidate. In the absence of specific proof to the contrary it is to be presumed that a voter would not consciously pull the lever over the name and position number of a candidate for whom he did not intend to vote.

The error on the Aylesford machine did, of course, affect every vote cast on it in the mayor's race, but it was not an irregularity that made it impossible to tell how the votes were cast on the face of the machine, which was the only "ballot" with which the voters came into contact, nor did it in any way reduce or compromise the presumption that the vote as correctly tabulated reflected the free choice of the voters in that precinct on that day.

7. The sufficiency of the evidence to support the trial court's findings with respect to the integrity of the Aylesford machine and the occurrence of the mistake is a question upon which there may be (and obviously is) a difference of opinion. Ours may not be the best, but by force of law it is the last. As counsel says, "The buck stops here." Suffice it to say that although the evidence was not absolutely conclusive, we think it would have been very difficult for any trial judge to arrive at findings contrary to those made by the trial court in this case. Most, though not all, of the countervailing evidence falls in the realm of possibilities, whereas the vital findings accord with the distinct probabilities.

8. There has been a good deal of controversy over the applicability and effect of KRS 61.060, which limits collateral attack upon official certifications. The alleged certifications in question are one made by the county court clerk to the effect that the voting machines had been properly prepared and tested and were ready for use in the election and one thereafter made by the election commissioners endorsing their approval in the book in which the county court clerk had entered the numbers of the machines opposite the numbers of the precincts. Both actions by these officers were made pursuant to KRS 125.080, which requires the clerk upon completing preparation of the machines to *"notify"* the election commissioners "that the machines are ready for use" and requires the commissioners, if the machines have been "found in proper order," to *"indorse their approval"* in the aforementioned book. [Our emphasis.]

Briefly, as we understand it, the theory is that Pettit's complaint in 2561 was not a direct attack on the certifications and did not sufficiently allege that they were the result of mistake on the part of the certifying officers, hence no evidence contradicting their correctness should have been allowed. Specifically, Amato objected to testimony by the commissioners and the clerk to the effect that they had not inspected the face of the Aylesford machine (or any of the other machines) after it had been prepared for the election.

Eventually the trial court acceded to this line of argument and admitted some of the

testimony [17] only by way of avowal. On the premise that a request for a recount cannot be amended after expiration of the filing time, a motion by Pettit for leave to amend the complaint in 2561 so as to allege the mistakes with adequate specificity was denied. Nevertheless, the trial court eventually concluded that the testimony was immaterial because it had no bearing on the condition of the machine on the day of the election, which was the focal point of the inquiry.

This particular problem settles out to be little more than a whirlwind in a teacup. In the first place, KRS 125.080 did not require these officers to "certify" any fact, and for that reason we doubt that KRS 61.060 has any relevance whatever to a clerk's notification that the machines are ready or to the commissioners' endorsement of approval. Even if the notice and the approving endorsements be considered as certifications by implication, what they certify are really conclusions rather than facts. Surely KRS 61.060 could not apply to the physical steps taken by the officers in arriving at their conclusions that the machines were in proper order. Secondly, since the amendment tendered by Pettit would neither have stated a new cause of action nor breathed life into one that had not been stated sufficiently to pass muster before a motion to dismiss, there was no valid reason why the trial court should not have allowed it if it was really necessary in view of KRS 61.060. There should be no policy compelling the law blindly to forbid amendments after the filing time in a recount proceeding when their purpose is merely to legitimate evidence that is otherwise relevant.

■ If the foregoing answers are not enough, there is the further circumstance that when the amended complaint was permitted to be filed in 2562 (the contest case) the conditions of KRS 61.060 were fully satisfied, and the evidence that may have been improperly admitted or admitted only by way of avowal in 2561 (the recount case) became admissible for purposes of 2562. Since the same findings were made in 2562 [18] and are free of the claimed taint upon the supporting evidence, our affirmance of the judgment in 2562 would render moot the question in 2561.

■ 9. It was not improper for the trial court to inspect the machines personally, whether or not a timely motion—or any motion—had been made.[19] It is not necessary to make a motion for relief that has been demanded in a pleading. The complaint asked a recount. There cannot be a recount without an inspection of the ballots to see how they were voted. It is the duty of the trial judge himself to make the physical recount. To do that, in the instance of machine voting, he must personally examine the machines, and this examination cannot be confined to the numbers shown on the counters, because the numbers mean nothing without a knowledge of exactly how they got there.

■ From the standpoint of using what he observed as further evidence vis-a-vis a non-evidentiary aid in understanding the testimonial evidence, particularly with respect to the integrity issue,[20] it

---

17. Some of the offending testimony (for example, that of McKeehan) had already been given without objection.

18. It is not clear whether the findings in 2561 with respect to Aylesford precinct were treated as *res judicata* in 2562, but even if they were, and if it be postulated that the 2561 findings were erroneous by reason of the evidence in question, with the same evidence again being before him in 2562, this time free of the alleged inadmissibility, it is ob-

vious that the trial judge would have made the same findings independently.

19. The fact is, however, that on the first day of the hearings Mr. Brooks, of counsel for Pettit, did indicate his desire to make the machines a part of the evidence if formal introduction was necessary.

20. "And it should be observed here that cases may arise in which that question [the integrity of the ballots] cannot be decided until the ballot boxes are opened and the ballots

must be remembered that in a trial by the court without a jury the judge has the same leeway as a jury. He is entitled to ask questions of his own. Though it is true that his observations are not subject to cross-examination, neither are those of the jurors, which are not even reduced to writing and are therefore never even disclosed, either to counsel or the court.

10. The most difficult question in the case is whether the absentee ballots should have been eliminated *in toto* because of the irregular manner in which they were handled and counted.[21] Fortunately there have been two decisions by this court in recent years in which the facts were similar enough to bear comparison with this case, the differences between the statutes then and now being immaterial in principle. Just as unfortunately, upon cursory reading they seem almost to have reached opposite results.

■ From the face of the opinion the deviations from the statute in Jarboe v. Smith, Ky., 350 S.W.2d 490 (1961), appear more flagrant than in this case, yet they were held not to be fatal. There the ballots, after being taken from the inner envelopes and separated from the stubs by which the respective voters could have been identified, were stacked on a table and then counted, evidently without having been first returned to the ballot box and shaken up.[22] That being substantially what took place in the instant case, this particular irregularity, as explicitly held in *Jarboe*, does not serve to invalidate the ballots.

The same point was not involved in the other case, Hale v. Goble, Ky., 356 S.W.2d 33 (1962). There the ballots were replaced in the ballot box and shaken up before

being counted, but for some reason the election commissioners had refused to allow the challengers for the candidates to inspect the envelopes and affidavits. This appears to have been the most significant single circumstance by which the court in *Hale* distinguished *Jarboe*, though it was observed in the opinion that the facts of the two cases differed considerably, the commissioners in *Jarboe* having "substantially complied with the law" whereas in *Hale* there had been "virtually no compliance with the law." 356 S.W.2d at p. 34.

The failure to return the inner envelopes to the box before opening them and counting the votes is the most serious irregularity that occurred in the handling of the absentee ballots in this case, because that is the stage during which the secrecy of the ballots was in most danger of being violated. Had it been made to appear that the inner envelopes were opened and the ballots exposed as they were removed from the outer envelopes, the fact of such a violation of secrecy would be established, obliging us to decide a different question. As it is, the one we are called upon to decide was settled in *Jarboe* and is not treated in *Hale* except as one of a total set of circumstances characterized as "virtually no compliance with the law."

Such a characterization could not fairly be applied to the facts of this case. Integrity and secrecy of the ballots and an open, accurate count all were proved. We concur in the trial court's judgment that under the circumstances the irregularities were not sufficient to justify disfranchising the absentee voters.

With all of the legal technicalities out of the way, the simple question in this whole complicated case is, for whom in fact did the majority cast its vote in the mayor's

themselves inspected . . ." Phillips v. Kincaid, 194 Ky. 750, 240 S.W. 737, 738 (1922).

21. That the ballots were not brought out to be counted at the earliest time permitted by KRS 125.250(2) is not a vital point.

22. At least, whether or not they had been was not made clear.

 

race on November 6, 1973? With the best means humanly available the trial court answered that question, and we are unable to find any error of substance in either of its judgments.

The judgments are affirmed. The mandates shall issue immediately, but without prejudice to petitions for rehearing.

All concur except for REED, J., who did not sit.