Richard E. WOOD, Movant,

v.

Lucky Kenneth KIRBY et al.,
Respondents.

Supreme Court of Kentucky.

May 2, 1978.

Rehearing Denied July 3, 1978.

C. Terry Earle, McGaw & Earle, Madison-
ville, Arthur L. Brooks, Brooks & Sullivan,
Lexington, for movant.

Rees Kinney, Jarvis, Payton & Kinney,
Greenville, for respondents.

STERNBERG, Justice.

This is an election contest which resulted
from the malfunctioning of one voting ma-
chine. The Court of Appeals of Kentucky
decided the issues by an opinion rendered
on July 22, 1977, and a discretionary review
was granted by this court on November 14,
1977.

In his petition filed in the Muhlenberg Circuit Court Wood charged that by reason of a defective voting machine in one of the voting precincts the votes to which he was entitled were not tabulated to him, thereby reducing the total number of votes to which he was entitled, and had he received those votes he would have received a plurality and would have been elected.

At the regular 1976 county school board election in District # 5, in Muhlenberg County, Kentucky, 527 votes were tabulated for Richard E. Wood and 704 votes were tabulated for Lucky Kenneth Kirby, which resulted in a difference of 177 votes in favor of Kirby, who at that time was the incumbent. The petition sought to have Wood declared the winner or, in the alternative, sought to have the court find that there was no proper election and to provide for a special election. A recanvassing of the votes resulted in Kirby being declared the winner.

The only avenue of dissent was with the votes tabulated on one of two machines used in the Beechmont precinct. District # 5 of the county school board is composed of parts of Beechmont, Penrod, East Courthouse and Ennis voting precincts. One of the machines reported 441 persons voting, and this machine will be referred to hereafter as the "good" machine. The other machine reported 432 persons voting, and hereafter this machine will be referred to as the "bad" machine. This makes a total of 873 votes cast in the Beechmont precinct. On the recanvass it was discovered that the "good" machine worked properly and correctly tabulated each person's vote; however, the "bad" machine was found to tabulate only 9 votes for Wood, yet tabulated the votes correctly as to Kirby's. On the "good" machine Kirby received 159 votes and Wood received 241 votes. The "bad" machine tabulated Wood as receiving 9 votes and Kirby as receiving 172 votes. On the "bad" machine the public counter showed 432 votes as having been cast; thus 251 votes remained unaccounted for. These 251 votes constitute over 50% of the votes which the public counter indicated actually voted on the bad machine and over 25% of all the votes cast in the Beechmont precinct.

The trial court found:

"* * * There is no way that a fair and impartial mind can ascertain, with any reasonable certainty, the actual number of legal votes that should be credited to Wood on the 'bad' machine.

It is the JUDGMENT of this court that there has been no election and the office of member of the Muhlenberg County Board of Education, School District # 5 is hereby declared vacant, with the same legal effect as if the person elected had refused to qualify."

The Court of Appeals considered two issues:

"I. Was the trial court in error in refusing to allow Wood to introduce into evidence the testimony of persons who voted on the faulty voting machine in the Beechmont precinct and who would voluntarily testify for whom they voted in said election in order to prove that Wood in fact received a majority of the votes cast in the school board election in question?

II. Did the trial court have jurisdiction under KRS 120.165(4) to declare that there had been no election in the present case where it appeared from the record that a number of votes sufficient to affect the outcome of the election were not counted because of the failure of a voting machine to properly register the votes cast on it?"

■ On review by this court the same two issues are presented. We approach these issues with the constitutional mandates in mind, that elections must be free and equal (Ky.Const. Sec. 6) and elections shall be by secret ballot (Ky.Const. Sec. 147). We also bear in mind that this court has no inherent power to hear and decide election contests. To accomplish that purpose, the General Assembly must act. This, it has done.

■ It is argued that the persons who voted on the machine which had mechanical difficulties should be permitted to voluntar-

ily testify for whom they voted, it being contended that when this is done the votes that were not tabulated would go for Wood, thus giving him a majority and the election.

Kentucky has recognized the right to require a person who votes in a primary election to disclose the name of the person for whom he voted. *Heitzman v. Voiers,* 155 Ky. 39, 159 S.W. 625 (1913). On the other hand, Kentucky has refused to require a person who has voted in a general election to disclose the name of the person for whom he voted. *Little v. Alexander,* 258 Ky. 419, 80 S.W.2d 32 (1934). The secrecy of the ballot was at the time of the adoption of Section 147 of the Kentucky Constitution and is now one of a voter's rights, guaranteed to him and highly guarded for him. There is a difference in the philosophy of the law in Kentucky dealing with primary elections as compared with general elections. The fact that a voter, or several voters, may be willing to disclose the name of the person for whom he cast his ballot in a general election will not justify the changing of so salutary a proposition that a voter may cast his vote without fear of having the name of the person or persons for whom he voted disclosed. We see no good reason to require a voter to disclose the name of the person for whom he voted in the general election; neither do we know of any good reason to permit a voter to voluntarily disclose the name of the person for whom he voted in the general election. The trial court and the Court of Appeals so held, and we concur.

Election contests are controlled by KRS 120.155, 120.165 and 120.185. In the instant case, however, we are concerned with KRS 120.165(4), which provides as follows:

"If it appears from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be judged to have been fairly elected, the circuit court, or the Court of Appeals, on appeal, may adjudge that there has been no election. In that event the office shall be deemed vacant, with the same legal effect· as if the person elected had refused to qualify. If one (1) of the parties is adjudged by the court to be elected to the office, he shall, on production of a copy of the final judgment, be permitted to qualify or be commissioned."

We are faced with the proposition of whether the conduct of the subject election was so irregular as to be tainted with fraud, thereby subject to challenge under KRS 120.165(4). First of all, we recognize that the Muhlenberg County Fiscal Court is charged with the responsibility of repairing and keeping in good mechanical condition the voting machines used in this election. *Jefferson County Fiscal Court v. Queenan,* 314 Ky. 271, 234 S.W.2d 949 (1950). Indeed, not only is the fiscal court responsible for repairing the voting machines and keeping them in good working order, but, as we stated in *Rives v. Pettit,* Ky., 513 S.W.2d 475 (1974), the candidates have the right to rely upon the assumption that the officers who prepared the machines and the officers who were required to inspect them have carried out their duties.

Both Kirby and Wood were justified in presuming that in the Beechmont precinct, as well as in all of the other precincts, the voting machines would be working properly. In the case at bar it is admitted that voting machine # 33506 was so mechanically malfunctioning that it would tabulate only 9 votes for Wood. It was tested by pulling the lever 100 times for each candidate, in keeping with the recanvassing procedure set out in KRS 117.305. Of the 432 votes cast on this machine, 9 were tabulated for Wood and 172 were tabulated for Kirby. On the other machine # 33520, which was used in the same voting place, of the 441 votes cast, 241 were tabulated for Wood and 159 for Kirby. In other words, on the malfunctioning machine Wood was tabulated with less than 3% of the votes cast in that precinct, while on the good machine he received over 50% of the votes cast. On the other hand, on the malfunctioning machine Kirby was tabulated with almost 40% of the votes cast, and on the machine that functioned properly he received 36%. There is

no reason shown why the ratio of votes that were actually tabulated by the malfunctioning machine should materially differ from those tabulated by the good machine. There is also no degree of certainty that the same number of persons whose votes were tabulated as voting in other races actually voted in the school board race. It is apparent, therefore, that some of the persons who voted, the number not being known, did not cast their ballots for either Wood or Kirby. It would be purely conjecture and engaging in speculation to allocate any number of votes to either Wood or Kirby. The total tabulated vote of all of the voters in the school district was 1,231. Of that number Kirby had 177 tabulated votes more than Wood. The number of votes cast on the malfunctioning machine was 432, which is 251 more than the combined vote tabulated for both Wood and Kirby in the Beechmont precinct. In the event that 178 votes of this number were received by Wood, he would have received one more vote than Kirby and would have won the election. Kirby can have no claim to any of the 251 votes because the tabulating mechanism which was accumulating his vote was properly functioning, and he received 172 votes. "In the absence of specific proof to the contrary it is to be presumed that a voter would not consciously pull the lever over the name and position number of a candidate for whom he did not intend to vote." *Rives v. Pettit,* Ky., 513 S.W.2d 475 (1974). If, with a reasonable degree of certainty, the 251 votes could be divided so as to ascertain the exact number that Wood received, there would be no need to void the election. Such cannot be done.

The Court of Appeals held that the only irregularity involved in this election contest was the malfunctioning of a voting machine, which did not constitute fraud within the provisions of KRS 120.165(4). Consequently, it held that the circuit court did not have jurisdiction. This court, on more than one occasion, has held to the contrary.

In *Harrison v. Stroud,* 129 Ky. 193, 110 S.W. 828 (1908), this court voided an election upon the theory that such a large percentage of the vote was so patently illegal it could be concluded that the conduct of the election was tainted with fraud and that the election should be set aside. The impropriety about which complaint was made was that approximately 20% of the voters were allowed to vote openly instead of by secret ballot.

In *Wells v. Wallace,* Ky., 337 S.W.2d 18 (1959), which was an election contest, many persons sought to be subpoenaed as witnesses evaded the process server, and the parties were not given the benefit of their testimony. We said:

"* * * However, it is equally contrary to orderly judicial process to indulge in mere speculation in an effort to guess which candidate received the majority of legal votes."

Further, we stated:

"In the case at bar there was no showing of intentional fraud, nor was there any intimidation, bribery, or violence proven in the conduct of the election, nevertheless, since the illegal votes secretly cast were so substantial in number and since it cannot be determined for whom they were cast, the election affecting the county judge's and coroner's races is held void under the authority of *Harrison v. Stroud,* supra. * * *"

In *Thurman v. Keen,* Ky., 444 S.W.2d 754 (1969), the question was whether the admitted noncompliance with election law by election officials in the preparation and operation of a voting machine taints the election process with fraud to such an extent that a proper tabulation of votes could not be done with a reasonable degree of certainty. The irregularity was brought about by reason of the public counter, on one of the machines, registering 497 votes instead of zero at the time the polls opened. At the close of the polls and tabulation of the votes there was a difference in the number of votes shown to have been cast by the protective counter and those shown to have been cast by the public counter of 497 votes. This is the same number of votes shown on the public counter when the polls opened. In other words, the only error was in start-

ing the tabulation at 497 instead of at zero. Irrespective of the erroneous number shown on the public counter, every person who voted had his vote properly counted. We held that under the circumstances the action of the election officials did not taint the election process to the extent necessary to void the election. We said:

"* * * It should be explicitly understood, however, by candidates and by election officials that under different facts and a proper showing we will not shrink from our duty to foster fair elections by rejecting the votes affected by violations of statutory requirements by election officials even though that judgment entails a disfranchisement of a number of legal voters. The effect on the election itself of a judicial rejection of votes is not presented under the facts of this case and we express no opinion on the applicability of *Watts v. Fugate,* Ky., 442 S.W.2d 569."

In *Rives v. Pettit,* Ky., 513 S.W.2d 475 (1974), it developed that the voting machine in one precinct tabulated the votes cast for the two candidates in reverse order. In other words, the votes intended to be cast for Candidate A were tabulated for Candidate B and the votes intended to be cast for Candidate B were tabulated for Candidate A. In the course of the opinion we said that we designate this as a mechanical error affecting the counting process. In defining the remedy for such, we said, "There is, indeed, no principle of law or other good reason why such an error could not be corrected in either a recount or a contest proceeding."

*Thompson v. Kenton County Board of Election Commission,* Ky., 535 S.W.2d 68 (1975), cited by counsel for Kirby, denied the right of an unsuccessful candidate for nomination to the office of city commissioner to contest a primary election. The issue in the case at bar does not involve a primary election; it involves the conduct of and an erroneous result achieved in a general election. Thus, *Thompson* is not applicable.

In the case at bar we designate the malfunctioning of the machine as a mechanical error affecting the counting process, which is subject to challenge by an election contest, thereby vesting the circuit court with proper jurisdiction.

The fraud contemplated by KRS 120.165(4) is not limited to conduct of or action by the candidates. It goes much further than that and includes what might be classified as constructive fraud. Constructive fraud arises through some breach of a legal duty which, irrespective of moral guilt, the law would pronounce fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests.

We are of the opinion that the mechanical failure in the tabulation of the votes was such as to color the election with fraud. We are further of the opinion that the proper tabulation of votes could not be done with a reasonable degree of certainty. Consequently, we hold the election void.

The opinion of the Court of Appeals is reversed, and the judgment of the Muhlenberg Circuit Court is affirmed.

All concur.